119 T.C. No. 12


UNITED STATES TAX COURT


CLAJON GAS CO., L.P., AQUILA GAS PIPELINE CORP.,
TAX MATTERS PARTNER, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15968-97.                    Filed October 25, 2002.


    Partnership C owned and operated natural gas
gathering systems to transport gas purchased from
natural gas producers.  C treated certain pipeline and
related components of the gathering systems as natural
gas production assets within asset class 13.2 of Rev.
Proc. 87-56, 1987-2 C.B. 674, with a 7-year recovery
period.
    Held:  Because C's use of its gathering systems
determines the proper asset class, and because C was
not a "natural gas producer", the components in
question are not within asset class 13.2; rather, they
are used by C to transport gas and are, therefore,
within asset class 46.0, with a 15-year recovery
period.  We shall follow our decision in Duke Energy
Natural Gas Corp. v. Commissioner, 109 T.C. 416 (1997),
revd. 172 F.3d 1255 (10th Cir. 1999).

Michael Thompson, Martin M. Loring, and Lori J. Sellers, for petitioner.

Robert M. Morrison, Michael C. Prindible, and Todd A. Ludeke for respondent.

HALPERN, Judge:  By notices of final partnership administrative adjustment dated April 28, 1997, respondent made adjustments to partnership returns filed by Clajon Gas Co., L.P. (Clajon), for taxable years ending December 31, 1990, September 25, 1991, December 31, 1991, and June 30, 1992 (the audit years). Taking into account issues and items resolved by the parties, the sole adjustments in dispute are respondent's adjustments reducing Clajon's deduction for "pipeline depreciation", as follows:

| Tax Year Ended | Adjustment |
|----------------|------------|
| 12/31/90 | $7,920,799 |
| 9/25/91 | 19,644,092 |
| 12/31/91 | 4,372,916 |
| 6/30/92 | 12,187,347 |

The issue for our decision is the proper cost recovery period to be used by Clajon in determining its depreciation deductions for the property in question.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner bears the burden of proof.  Rule 142(a).

FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

Principal Place of Business

At the time the petition was filed, Clajon's principal place of business was in San Antonio, Texas.

Natural Gas Production Process

Natural gas is extracted from the earth through gas wells. It leaves the earth at the wellhead and passes into flow lines. The flow lines carry the gas to a separator located at the well site or to a central production facility (which serves two or more wells), where, among other things, oil, water, and sand are removed from the gas.  The gas next flows to a meter installation for measurement and then enters a gathering system.

A gathering system is a system of interconnected subterranean pipelines and related facilities, including compression stations and metering installations, that aggregates gas from multiple wells for delivery to a transmission line or a gas processing plant.  A gathering system's smaller diameter pipelines, sometimes called feeder lines or lateral lines, connect individual wells or one or more central production facilities to larger diameter lateral lines or trunk lines that

eventually deliver the gas to a gas processing plant or to a transmission line.

Gas containing substantial amounts of natural gas liquids (NGLs), such as ethane, propane, butane, and natural gasoline (termed "wet gas"), must be fractionated to remove NGLs before the gas can be transmitted to consumers. Fractionation occurs at gas processing plants, where the resulting components are residue gas (primarily methane) and extracted NGLs. The NGLs are delivered by truck, rail, or pipeline to another specialized processing plant for further fractionation and marketing. The residue gas is delivered to a transmission line.

The person extracting the gas from the earth may own the gathering system, or it may be owned by an independent pipeline company (i.e., a company not in the business of extracting gas from the earth).

Clajon's Gathering Systems

During the audit years, Clajon's activities included purchasing, transporting, processing, and selling natural gas and NGLs. Clajon owned six natural gas gathering systems, all located in Texas (the Texas gathering systems), and two natural gas processing plants, one in College Station, Texas (which was closed in early 1990), and one in La Grange, Texas. The Texas gathering systems were known as the Southeast Texas Pipeline System, which gathered wet gas for delivery to the processing

plants, and the Mentone Pipeline System, Gomez Pipeline System, Maverick County Pipeline System, Rhoda Walker Pipeline System, and Panola County Pipeline System, which gathered gas containing little or no NGLs (termed "lean gas") for delivery to purchasers' transmission pipelines. The Panola and Rhoda Walker Systems provided compression and dehydration services. The Gomez and Mentone Systems provided dehydration services.

The Texas gathering systems included more than 1,100 miles of feeder, lateral, and trunk lines. Clajon, via the Texas gathering systems, purchased and transported gas from 190 third-party gas producers and more than 1,000 wells.

Clajon did not own any oil or natural gas reserves and did not own an economic interest in any well connected to the Texas gathering systems.

Clajon's Contractual Relationships

During the audit years, gas flowed through the Texas gathering systems under the following types of contracts: wellhead purchase contracts, gas processing contracts, and gas transportation contracts.

Under a wellhead purchase contract, Clajon purchases a producer's gas at a meter located at the producer's well. The price may be fixed, or it may be calculated based upon the price received by Clajon for residue gas at the tailgate of the gas processing plant.

A gas processing contract is similar, except that Clajon and the producer share revenues from Clajon's sale of extracted NGLs and residue gas.

Under a gas transportation contract, Clajon charges its customers a fee to move gas through one of the Texas gathering systems.

Depreciation Adjustments in Dispute

Respondent's adjustments to "pipeline depreciation" consist of separate adjustments with respect to "pipelines", "compressor stations" and "meter runs". Clajon depreciated those assets using a 7-year recovery period. Respondent determined that Clajon should have used a 15-year recovery period. We shall generally refer to the foregoing elements of Clajon's gathering system, collectively and without distinction, as "gathering pipelines".

OPINION

I. Introduction

This case involves a dispute as to the length (in years) of the recovery period that Clajon must use in calculating its annual depreciation deductions for the gathering pipelines. On similar facts, we decided in the Commissioner's favor in Duke Energy Natural Gas Corp. v. Commissioner, 109 T.C. 416 (1997), revd. 172 F.3d 1255 (10th Cir. 1999). Petitioner urges us not to follow our decision in Duke Energy and to adopt the reasoning of

the Court of Appeals for the Tenth Circuit in that case. <u>Duke Energy Natural Gas Corp. v. Commissioner</u>, 172 F.3d 1255 (10th Cir. 1999), revg. 109 T.C. 416 (1997). As explained below, we follow our decision in <u>Duke Energy</u>, and we hold that the proper recovery period for the gathering pipelines is 15 years.

## II. Applicable Statutory and Administrative Provisions

Section 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in * * * [a] trade or business". Section 167(b) references section 168 for determination of the depreciation deduction in the case of property to which section 168 applies. Section 168 is entitled "Accelerated Cost Recovery System", and it sets forth a cost recovery system based not on the useful life of an item of property but, instead, on certain congressionally determined (accelerated) recovery periods. In pertinent part, section 168(a) provides: "the depreciation deduction provided by section 167(a) for any tangible property shall be determined by using * * * the applicable recovery period". Pursuant to section 168(c) and (e), the recovery period for property is based upon (but, generally, is shorter than) its "class life". Section 168(i)(1) defines "class life" as "the class life * * * which would be applicable with respect to any property as of January 1,

1986, under subsection (m) of section 167".[1]  Section 167(m)(1), in pertinent part, provided for depreciation "based on the class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group."  Section 167(m) (which was added to the Internal Revenue Code by section 109 of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 508) codified, with certain modifications, the Asset Depreciation Range (ADR) system described in section 1.167(a)-11, Income Tax Regs., and, in particular, the regulations' adoption of asset guideline classes and periods or "class lives".[2]  See H. Rept. 92-533, 1972-1 C.B. 498, 514-516; S. Rept. 92-437, 1972-1 C.B. 559, 584-588.

Consistent with the directive in section 167(m)(1) to prescribe class lives for depreciable assets, section 1.167(a)-11(b)(4)(ii), Income Tax Regs., provides that asset guideline classes and periods (lives) will be "established, supplemented, and revised * * *, and will be published in the Internal Revenue Bulletin."  The regulation references Rev. Proc. 72-10, 1972-1

---

[1]  Sec. 167(m) was deleted from the Internal Revenue Code by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11812(a)(1), 104 Stat. 1388-534.

[2]  A notice of proposed rulemaking was published in the Federal Register on Mar. 13, 1971, 36 F.R. 4885, and a Treasury Decision setting forth final regulations was published in the Federal Register on June 23, 1971, 36 F.R. 11924.  See T.D. 7128, 1971-2 C.B. 132.  The final regulations were subsequently modified, in 1973, to conform the ADR system to sec. 167(m).  See T.D. 7272, 1973-1 C.B. 82.

C.B. 721, as setting forth the applicable "asset guideline classes".  Rev. Proc. 72-10 was the first of several revenue procedures establishing asset guideline classes, each superseding or obsoleting its predecessor and culminating in Rev. Proc. 87-56, 1987-2 C.B. 674.[3]  Rev. Proc. 87-56 is the revenue procedure establishing asset guideline classes that is in effect for purposes of this case.

The Rev. Proc. 87-56 asset guideline classes at issue in this case are as follows:

[Asset Class] 13.2  Exploration for and Production of Petroleum and Natural Gas Deposits:  Includes assets used by petroleum and natural gas producers for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities.  Also includes petroleum and natural gas offshore transportation facilities used by producers and others consisting of platforms (other than drilling platforms classified in Class 13.0), compression or pumping equipment, and gathering and transmission lines to the first onshore transshipment facility.  * * *

* * * * * * *

[Asset Class] 46.0  Pipeline Transportation:  Includes assets used in the private, commercial, and contract carrying of petroleum, gas and other products by means of pipes and conveyors.  The trunk lines and related storage facilities of integrated petroleum and natural gas producers are included in this class.  * * *

---

[3]  Rev. Proc. 87-56, 1987-2 C.B. 674, was issued to take into account amendments made to sec. 168 as part of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2121.

Property within Asset Class 13.2 (13.2) is assigned a class life of 14 years and has a recovery period of 7 years; property within Asset Class 46.0 (46.0) is assigned a class life of 22 years and has a recovery period of 15 years. Rev. Proc. 87-56, 1987-2 C.B. at 678, 684.[4]

III. Class Lives Are Composite Lives

Historical material pertaining to the ADR system establishes that the class lives contemplated in section 1.167(a)-11(b)(4)(ii), Income Tax Regs., and established by Rev. Proc. 87-56, supra, and preceding revenue procedures, are composite lives. In other words, each class life is based on the useful lives of the assets constituting the class but does not necessarily equal the useful life of any constituent asset.

In June 1971, contemporaneous with the adoption of section 1.167(a)-11, Income Tax Regs., by T.D. 7128, 1971-2 C.B. 132, the Department of the Treasury published "Asset Depreciation Range (ADR) System" (U.S. Government Printing Office: 1971 O-428-904) (hereafter referred to as Treasury Publication or T.P.). The Treasury Publication states that, in 1962, with the publication

---

[4] The recovery periods assigned to property within 13.2 and 46.0 are in accordance with sec. 168(c)(1) and (e)(1), which, together, provide that the recovery period for property with a class life of 10 or more years but less than 16 years is 7 years, and the recovery period for property with a class life of 20 or more years but less than 25 years is 15 years.

of Rev. Proc. 62-21, 1962-2 C.B. 418, the Treasury introduced a fundamental change in the concept of depreciation. T.P. at 212-213. The fundamental change was to classify assets on a basis other than the particular life of the particular asset to the particular user. Id. at 215. On the new basis, assets were classified "as a stock of capital even though assets within a class were heterogeneous with respect to ages, useful lives, and physical characteristics." Id. "Assets within the class would have individual lives far longer and far shorter than the guideline class life." Id. at 215-216. The Treasury Publication describes Rev. Proc. 62-21 as providing a substitute for the thousands of asset classifications of the previous system. Id. at 212-213. Under Rev. Proc. 62-21, "assets were grouped by broad industrial classifications and by certain broad general asset classifications, with a 'guideline life' established for each of these classes." Id. at 213. An examination of the asset guideline classes in Rev. Proc. 62-21 discloses that, generally, the classes are tied to particular business activities. The drafters of the revenue procedure recognized that the anticipated useful life of many assets, even the same types of assets, will vary in accordance with the experience of persons using such assets. The drafters assumed that persons in the same business activity would have similar experiences and, except for assets

used by businesses generally (e.g., trucks and railroad cars), generally classified assets by business activity.

The Treasury Publication describes the ADR and class life system then being established by Treasury decision (T.D. 7128, 1971-2 C.B. 132, adopting section 1.167(a)-11, Income Tax Regs.) as, essentially, an extension and modification of the asset guideline class approach taken in Rev. Proc. 62-21.  T.P. 212-219.  The Treasury Publication describes adoption of the new system as being prompted, in part, by (1) recognition that it had been more than 7 years since there had been any significant changes in the guidelines classes or lives, and (2) requests from members of Congress that Treasury study the adequacy of the then existing depreciation allowances.  Id. at 215, 217-218.

Reflecting the approach that had been taken in Rev. Proc. 62-21, supra, and section 1.167-11, Income Tax Regs., Congress, in section 167(m)(1), provided that, for each class of property, the Secretary must prescribe a class life that reflects the anticipated useful life of that class of property "to the industry or other group."  Pursuant to that mandate, the Secretary had the authority to, and did, subdivide industries, establishing asset guideline classes inclusive of one or more sectors of the industry and exclusive of others.  Thus, the same asset used in more than one sector of an industry might be

included in two or more asset guideline classes, each with its own (different) class life.[5]  Gathering pipelines are subject to depreciation by both natural gas producers (under 13.2) and pipeline companies (under 46.0).

IV.  Duke Energy

In Duke Energy Natural Gas Corp. v. Commissioner, 109 T.C. at 421, we concluded that the taxpayer's gathering systems were "used primarily by a pipeline company [the taxpayer] to carry gas to a production facility, which * * * brings them within asset class 46.0."  In reaching that conclusion, we rejected the taxpayer's argument "that its gathering systems are included in asset class 13.2 because the systems are used by petroleum and natural gas producers to produce natural gas in that the systems are essential to the production and sale of gas in the market."  Id.  We noted:  "The mere fact that the gathering systems may

---

[5]  For example, Rev. Proc. 87-56, 1987-2 C.B. 674, provides that "assets used in the drilling of onshore oil and gas wells" are generally includable within Asset Class 13.1, which has a 6-year class life and a 5-year recovery period.  Asset Class 13.1 specifically excludes "assets used in the performance of any of these activities * * * by integrated petroleum and natural gas producers for their own account".  Asset Class 13.2, on the other hand, which specifically pertains to "assets used by petroleum and natural gas producers for drilling of wells and production of petroleum and natural gas" has a 14-year class life and a 7-year recovery period.  An onshore oil drilling rig, therefore, has a shorter class life and recovery period if owned and used by a person whose sole activity is well drilling than it would have if owned and used by an integrated oil and gas producer.

have helped producers produce and sell their gas in the market does not mean that the systems are exploration or production assets within * * * asset class 13.2." Id.

In reversing our decision in Duke Energy, the Court of Appeals for the Tenth Circuit reasoned that "the plain language of Asset Class 13.2 leads most logically to a reading that includes Duke's gathering systems even though they are 'used by' producers through contractual arrangements with Duke." Duke Energy Natural Gas Corp. v. Commissioner, 172 F.3d at 1259. The Court of Appeals stated that "Duke's gathering systems are literally used by producers for gas production in a number of different ways", id. at 1258, noting the parties' agreement that "producers would not be able to produce natural gas in the absence of an adequately designed gathering system", id. After reviewing the overall function and usage of gathering systems, the Court of Appeals stated that "the economic character of Duke's gathering activities is more akin to production than pipeline operation." Id. at 1259. The Court of Appeals rejected the Government's argument that the words "used by" in 13.2 incorporate an ownership requirement, reasoning: "'Use' does not mean 'own' in either the legal dictionary definition of the word use * * * nor in everyday parlance." Id. Ultimately, the Court concluded as follows:

Because of the primary use of gathering systems in the process of producing natural gas, as well as the plain language of the asset class descriptions, Duke's gathering systems fit more logically within Asset Class 13.2 than Asset Class 46.0.  [Fn. ref. omitted.]

Id. at 1262.[6]

V.  Nonapplication of Golsen v. Commissioner

Under the rule of Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), this Court will

_____

[6]  The Court of Appeals for the Tenth Circuit distinguishes between "gathering pipelines", which "fall within Asset Class 13.2", and "trunk lines and related storage facilities", which "fall within Asset Class 46.0", stating that "it is undisputed that trunk lines and gathering systems are mutually exclusive terms referring to different types of pipeline systems." Duke Energy Natural Gas Corp. v. Commissioner, 172 F.3d 1255, 1259 (10th Cir. 1999), revg. 109 T.C. 416 (1997).  Petitioner argues that Clajon's trunk lines are part of its gathering system and, like the rest of the system, must be included within 13.2. Petitioner urges that we distinguish the Court of Appeals' classification of trunk lines on the basis that that court must have considered Duke Energy's trunk lines to be transmission rather than gathering pipelines.  Because we conclude that all of the pipelines in the Texas gathering systems fall within 46.0, we need not address the Court of Appeals' refusal to treat trunk lines as part of the gathering system for asset classification purposes.

In concluding that petitioner's trunk lines are includable within 46.0, we obviously reject petitioner's suggestion that the specific inclusion, within 46.0, of "trunk lines * * * of integrated * * * natural gas producers" necessarily implies the exclusion of its trunk lines from that asset class (since it is not an integrated natural gas producer).  We view the quoted language as simply intended to clarify that an integrated producer's trunk lines are not to be considered gathering pipelines includable within 13.2.  That language has no bearing upon the inclusion, within 46.0, of trunk lines owned and used by a pipeline company like petitioner.

"follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals". At the time the petition was filed, Clajon's principal place of business was San Antonio, Texas. Pursuant to section 7482(b)(1)(E), an appeal from our decision in this case would likely lie to the Court of Appeals for the Fifth Circuit, where there is no authority on point. We are, therefore, not required by Golsen to follow the Court of Appeals for the Tenth Circuit's decision in Duke Energy Natural Gas Corp. v. Commissioner, supra.

VI. The Gathering Pipelines Fall Within 46.0 Rather Than 13.2 Because Clajon Was Not a "Producer," and It Is Clajon's Use That Is Relevant

A. Analysis

1. Clajon Was Not a "Producer" of Natural Gas

In order for the gathering pipelines to be included in 13.2, it is necessary that they be "used by" a natural gas "producer" for "production of" natural gas. There is, thus, both an "actor" requirement (used by) and an "activity" requirement (the production of natural gas) necessary for 13.2 classification. The actor requirement is satisfied if the gathering pipelines are used by a natural gas "producer". Duke Energy conceded that it was "not a producer of gas as that term is used in the asset class descriptions of MACRS." Duke Energy Natural Gas Corp. v. Commissioner, 172 F.3d at 1256 n.2 (apparently referring to the

asset guideline classes set forth in Rev. Proc. 87-56, supra).
Although petitioner has not specifically conceded (nor has it
been stipulated) that Clajon is not a producer of natural gas,
counsel for petitioner tacitly admitted as much during the trial
and, again, during the posttrial oral argument.  Similarly,
petitioner's expert witness acknowledged that a gas gatherer is
not a producer of natural gas.  Therefore, we find that Clajon
was not a producer as that term is commonly used in the natural
gas industry.  Authorities in the oil and gas field agree.  See
Williams & Meyers, Manual of Oil and Gas Terms 846 (11th ed.
2000), generally defining a producer as "[a]n operator who owns
wells that produce * * * gas."[7]

> 2. The Relevant "Use" Under 13.2 and 46.0 Is That of
> the Taxpayer, Clajon

> a. Introduction

In Duke Energy Natural Gas Corp. v. Commissioner, supra, the
Court of Appeals focused upon industry (rather than taxpayer)
usage of Duke Energy's gathering system.  It concluded:  "Within
the industry and in the functional and contractual relationship
between producers and nonproducer gathering system owners, Duke's
gathering systems are literally used by producers for gas

---

[7] The parties have stipulated that Clajon owns no oil or
natural gas reserves, nor does it own an economic interest in the
wells connected to the Texas gathering systems.

production".  Id. at 1258.  This focus fails to take into account, and is contrary to, an important aspect of the regulations authorizing the issuance of Rev. Proc. 87-56, 1987-2 C.B. 674, and its predecessor revenue procedures.  The regulations require not only that property be classified by the type of activity in which the property is used but also that the taxpayer depreciating property on the basis of a particular class life must itself be engaged in (be the actor in) the activity described in the asset guideline class.  Moreover, the Court of Appeals' focus fails to take into account the segmented approach to the natural gas industry taken in Rev. Proc. 87-56, supra.

    b.   The Regulations

    Section 1.167(a)-11(b)(4)(iii)(b), Income Tax Regs., states that "property shall be included in the asset guideline class for the activity in which the property is primarily used" and that "[p]roperty shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities." (Emphasis added.)  Because the regulation considers the substantiality of the primary use activity in relation to all of the taxpayer's activities, we interpret the regulation as comparing a part to the whole (i.e., one of the taxpayer's activities is compared to all of the taxpayer's activities) so

that it is the <u>taxpayer's</u> primary use of the property that is relevant. It is, thus, the <u>taxpayer's</u> primary use of the property, and not some other person's use, that determines classification.[8] The taxpayer in question, of course, is the person electing to use asset guideline classes for purposes of computing its depreciation deductions for property placed in service during the year.[9] That it is only the electing taxpayer's use that counts is verified by the special rule in the regulations that applies to leased property. After stating the general rule that "property shall be included in the asset guideline class for the activity in which the property is

---

[8] Generally, as in this case, the taxpayer is the owner of the property. See, however, sec. 1.167(a)-4, Income Tax Regs., which provides for lessee depreciation of permanent leasehold improvements to a lessor-owner's premises; see also <u>Depot Investors, Ltd. v. Commissioner</u>, T.C. Memo. 1992-145 (allowing lessee cost recovery of a leasehold improvement over the remaining lease term).

[9] Sec. 1.167(a)-11(b)(1), Income Tax Regs., provides: "The allowance for depreciation of eligible property * * * to which <u>the taxpayer</u> elects to apply this section shall * * * constitute the reasonable allowance for depreciation of such property under section 167(a)." (Emphasis added.)

Although Clajon is a partnership and, thus, not itself subject to the income tax, see sec. 701 (partners not partnership subject to income tax), the depreciation deduction is taken in computing Clajon's taxable income, see sec. 703(a), and the regulations provide that, if a partnership places eligible property in service, the <u>partnership</u> is to make the election to apply sec. 1.167(a)-11, Income Tax Regs., sec. 1.167(a)-11(e)(3)(ii), Income Tax Regs.

primarily used", section 1.167(a)-11(b)(4)(iii)(<u>b</u>), Income Tax Regs., cross-references paragraph (e)(3)(iii) "for [the] rule for leased property". The referenced paragraph provides: "In the case of a lessor of property [claiming an allowance for depreciation of leased property], unless there is an asset guideline class in effect for lessors of such property, the asset guideline class for such property shall be determined <u>as if the property were owned by the lessee</u>." (Emphasis added.) That provision would be wholly unnecessary under the "industry usage" rationale of the Court of Appeals in <u>Duke Energy Natural Gas Corp. v. Commissioner</u>, <u>supra</u>.[10] Moreover, the regulation drafter's analogy to deemed <u>ownership</u> by the lessee strengthens the presumption that, in general (outside the special case for leased property), it is the taxpayer-owner's use of property that determines its proper classification.

It is true that, in the case of the activity-based classifications,[11] Rev. Proc. 87-56, <u>supra</u>, does not specifically

---

[10] Under that rationale, the fact that the property in question is leased would have no bearing whatsoever on the determination of the asset guideline class for such property, for it is of no consequence whether the lessor or lessee of property is considered the owner if, as stated by the Court of Appeals for the Tenth Circuit in <u>Duke Energy Natural Gas Corp. v. Commissioner</u>, <u>supra</u> at 1259, primary use of the property is unrelated to ownership.

[11] Some of the asset guideline classes set forth in Rev. Proc. 87-56, 1987-2 C.B. 674, are based upon the type of property (such as trucks or railroad cars) as distinguished from the
(continued...)

state that only the taxpayer's activities are relevant. We
conclude, however, that, because such limitation is contained in
the regulations pursuant to which Rev. Proc. 87-56, supra, was
issued, it is implicit in all activity-based classifications,
including 13.2 and 46.0. We must, therefore, look to such
classifications to see which describes petitioner's activities.[12]

---

[11](...continued)
activity in which property is used.

[12] The dissenters assume that, as described by Judge Foley,
the "central issue" in this case is whether Clajon's gathering
pipelines were "used by * * * producers for * * * production of *
* * natural gas". Judge Foley, finding no ambiguity in the verb
"to use", criticizes us for failing to be governed by the "plain
language" of 13.2. The dissenters ignore the fact that a similar
criticism could be leveled against them, since the plain language
of 46.0, which includes "assets used in * * * carrying * * * gas"
(emphasis added), unambiguously includes Clajon's pipelines.
Assuming, arguendo, that the producers use Clajon's pipelines
(rather than simply benefit from Clajon's own use of its
pipelines), the "central issue" is which use -- the producers' or
Clajon's -- controls the determination of the proper recovery
period. The proper inquiry is not whether 13.2 is or is not
ambiguous but, rather, whether 13.2 is applicable at all.

The dissenters' reliance on the plain language of 13.2 to
support their analysis is also undercut by their ultimate
reliance not on the plain language of 13.2 but on the
regulations, which clarify that the primary use of property
controls its classification under Rev. Proc. 87-56. Moreover,
the dissenters fail to reconcile their plain language analysis
with the special rule for leased property found in section
1.167(a)-11(e)(3)(iii), Income Tax Regs. That rule, which, in
effect, looks to the lessee's primary use of property in
determining its proper asset guideline class, necessarily implies
that, under the general rule applicable to nonleased property
(i.e., under the first sentence of section 1.167(a)-
11(b)(4)(iii)(b), Income Tax Regs.), it is the owner-taxpayer's
primary use of property that determines its proper asset
(continued...)

c.  Rev. Proc. 87-56

(1)  Intra-Industry Asset Classes

The focus of the Court of Appeals on industry usage of gathering pipelines also ignores the fact that Rev. Proc. 87-56, 1987-2 C.B. 674, does not provide one asset guideline class for the whole "gas industry".  Rather, several classifications apply to the industry, each designed to encompass a segment of the industry, including "Offshore Drilling" (13.0), "Drilling of Oil and Gas Wells" (13.1), "Exploration for and Production of Petroleum and Natural Gas Deposits" (13.2), "Pipeline Transportation" (46.0), "Natural Gas Production Plant" (49.23), "Gas Utility Trunk Pipelines and Related Storage Facilities" (49.24), and "Liquefied Natural Gas Plant" (49.25).

That segmented approach to the oil and gas industry is entirely consistent with the statutory scheme.  Under former section 167(m)(1), the depreciation allowance for property

----

[12](...continued)
guideline class.  Thus, Judge Foley's interpretation of the third sentence of section 1.167(a)-11(b)(4)(iii)(b), Income Tax Regs., as referencing the insubstantiality of anyone's primary use of property in relation to all of the taxpayer's activities is not sustainable.  Moreover, we note that, had Clajon leased rather than owned its gathering systems, the lessor would have been required by the regulations to treat Clajon's (not the producers') primary use of such systems as controlling the determination of the proper asset guideline class.  There is no conceivable basis for interpreting section 1.167(a)-11(b)(4)(iii)(b), Income Tax Regs., as treating the producer's primary use as controlling where the pipeline company owns rather than leases its gathering systems.

included in any asset guideline class must be based upon the "class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group." (Emphasis added.) Such an approach is also consistent with Treasury's description of section 1.167(a)-11, Income Tax Regs., as, essentially, an extension of the composite class life system adopted in Rev. Proc. 62-21, 1962-2 C.B. 418. See supra sec. III.

(2) Asset Class 13.2

Asset guideline class 13.2 describes property, including gathering pipelines, used by natural gas producers. Since, however, we have found that petitioner is not a natural gas producer, its gathering pipelines are not 13.2 property. Given the composite nature of class lives, that is an appropriate result. If a taxpayer is not engaged in the activity described in an asset guideline class, then the associated class life is not representative of the life of any class of business assets owned by him. Only by coincidence would the class life be the useful life of any asset owned by the taxpayer. To permit such a taxpayer to depreciate a particular asset or type of asset on the basis of a composite class life designed for a completely different group of taxpayers utilizing a completely different mix of assets would be to frustrate the overall intent and design of the class life system adopted by Congress and implemented by the

regulations and by Rev. Proc. 87-56, supra. Petitioner is not a gas producer and, therefore, has no claim on 13.2.

The point is aptly illustrated by the treatment of drilling equipment under Rev. Proc. 87-56, supra. Asset class 13.1 (13.1), entitled "Drilling of Oil and Gas Wells", provides a 6-year class life and 5-year recovery period for "assets used in the drilling of onshore oil and gas wells", e.g., an oil or gas drilling rig. The same assets "used by petroleum and natural gas producers" fall within 13.2, which, as noted above, provides a 14-year class life and 7-year recovery period. Just as a drilling rig may have two different class lives and recovery periods, depending upon the asset class within which it is includable, so too may gathering pipelines be subject to different class lives and recovery periods depending upon the user and the asset class appropriate to that user.

(3) Asset Class 46.0

Petitioner argues that 46.0 is intended to encompass only transmission pipelines. In support of its argument, petitioner states that, within the natural gas industry, "the term 'transportation pipeline' is synonymous with 'transmission pipeline'", and that the Federal Energy Regulatory Commission (FERC) distinguishes between gathering, over which it lacks jurisdiction, and the interstate transportation of natural gas, over which it has jurisdiction, a distinction upon which the

Court of Appeals for the Tenth Circuit also relies.  See Duke

Energy Natural Gas Corp. v. Commissioner, 172 F.3d at 1261-1262.

We reject petitioner's argument for several reasons.

To begin with, 46.0, although entitled "Pipeline

Transportation", encompasses "assets used in the private,

commercial, and contract carrying of * * * gas * * * by means of

pipes".  (Emphasis added.)  The alleged term of art,

"transportation", nowhere appears in the descriptive language of

46.0, and it is clear that Clajon's primary use of its gathering

pipelines is "in * * * carrying * * * gas".[13]  Thus, the plain

---

[13]  In our discussion to this point, we have not
distinguished between the pipelines, compression stations, and
metering installations constituting what we have termed "the
gathering pipelines".  Although respondent made separate
adjustments with respect to such components, the adjustments were
similar, and the bulk of the adjustments (in excess of 90
percent) were with respect to the pipelines. (Less than 0.5
percent were with respect to the meter runs.)  We have had no
need to distinguish among the components since the issue is
whether petitioner is a natural gas producer, not whether the
components of its gathering system are within the meaning of the
term "gathering pipelines" as it is used in 13.2.  With respect
to the placement of such components within 46.0, certainly
Clajon's primary use of its pipelines was in carrying or
transporting gas.  Moreover, because the sole function of field
compression is, in the words of petitioner's expert, "to push the
gas from one location to another through the gathering system",
the same is true of Clajon's compressor stations.  The so-called
"meter runs" are not separately discussed in either the trial
record or the briefs.  However, if they are simply meters used to
ascertain the quantity of gas flowing through the pipelines (the
definition of a "meter" set forth in Williams & Meyers, Manual of
Oil and Gas Terms 626 (11th ed. 2000)), we see no reason to
differentiate them from the pipelines in terms of primary use.

language of 46.0 supports the inclusion of Clajon's gathering pipelines within that asset class.

Secondly, we do not agree with the conclusion of the Tenth Circuit Court of Appeals that FERC's distinction between gathering and transmission lines necessarily establishes that FERC considers gathering systems as related to production.[14]  See Duke Energy Natural Gas Corp. v. Commissioner, supra at 1262.  In section 1(b) of the Natural Gas Act of 1938, Pub. L. 688, 52 Stat. 821, currently codified at 15 U.S.C. sec. 717(b) (2000) (NGA), it is provided that the NGA "shall apply to the transportation of natural gas in interstate commerce * * * but shall not apply to  * * * the production or gathering of natural gas."  The quoted language indicates that Congress considered "gathering" to be separate and distinct from "production".  Indeed, had it considered "gathering" to be included within the term "production", Congress would not have found it necessary to separately exclude both from Federal regulation.  Moreover, that FERC does not consider gathering and transportation (of gas) to be mutually exclusive terms is illustrated by another decision of

---

[14]  Although we have found that petitioner's gathering pipelines are ineligible for inclusion within 13.2, a finding that such pipelines are primarily production related might justify their classification (in the hands of a nonproducer) as "Personal Property With No Class Life" entitled to the same 7-year recovery period.  See Rev. Proc. 87-56, 1987-2 C.B. 674, 687.  Petitioner has not on brief argued for such classification.

the Court of Appeals for the Tenth Circuit, which involved the question of FERC jurisdiction over an interstate gathering system. See Northwest Pipeline Corp. v. FERC, 905 F.2d 1403 (10th Cir. 1990). In that case, FERC had asserted jurisdiction over the system on the basis that the primary function of the system was "the transportation of natural gas in interstate commerce." Id. at 1405, 1410. The Court of Appeals disagreed that transportation was the primary function of the system if transportation was only incidental to an exempt function of the system (i.e., gathering natural gas): "Some transportation must occur to move the gas from the wellhead in some manner. What the Commission must decide in applying the primary function test is whether that transportation is incidental to traditional gathering functions and, thus, exempt from its jurisdiction." Id. at 1410-1411 (fn. ref. omitted). It is clear, however, that both FERC and the Court agreed that gathering pipelines are used to transport natural gas.

Thirdly, although petitioner's expert was of the opinion (and respondent's principal expert did not disagree) that gathering pipelines have a shorter useful life than do transmission or distribution pipelines,[15] that does not persuade

[15] Distribution pipelines, like transmission pipelines, carry lean gas. They are fed by transmission pipelines and connect to the premises of the ultimate consumers of the gas.
(continued...)

us that the class life of 22 years assigned to 46.0 is inappropriate for gathering pipelines. The class life of 22 years assigned to 46.0 is a composite life, and petitioner has made no showing that, on a composite basis, that life does not fairly balance the relatively short life of gathering pipelines against the relatively long lives of transmission or distribution pipelines.[16]

B. <u>Conclusion</u>

Because Clajon is not a "producer" of natural gas, and because it is Clajon's use of its gathering pipelines that is

---

[15](...continued)
See Williams & Meyers, Manual of Oil and Gas Terms 290-291 (11th ed. 2000).

[16] There is nothing in the record to indicate that the useful life of gathering pipelines is so short that placing them in the same asset class as transmission and distribution pipelines would be somehow inappropriate. Respondent's principal expert did not disagree with the statement by petitioner's expert that the life of a natural gas gathering system cannot exceed the life of the gas field or fields that it serves. Respondent's expert stated, however, that gas gathering areas are extended and gathering pipelines are added to the system as new wells are developed within the field, a process that "may continue for * * * 50 years or more." He also noted that "new technology or enhanced recovery can extend the life of an oil or gas field, which will extend the life of a gathering system." Such longevity is exemplified by Clajon's Southeast Texas Pipeline System, which has been in operation since the late 1970s. It is also a fact that gathering pipelines transporting lean gas directly to customer transmission lines (such as those constituting Clajon's five smaller gathering systems) are not subject to the corrosive elements that tend to shorten pipeline useful life. Moreover, the experts appeared to agree that even pipelines carrying raw gas remain in service throughout the life of the gas field or fields that they serve.

relevant under 13.2, such gathering pipelines were not "used by" a natural gas "producer" as required for inclusion within such asset guideline class.  Rather, Clajon's gathering pipelines are includable within 46.0 since they are "assets used [by Clajon] in the * * * carrying of * * * gas * * * by means of pipes and conveyors."[17]

VII.  Conclusion

Clajon is required to depreciate the gathering pipelines utilizing a 15-year recovery period.

Decision will be entered

under Rule 155.

Reviewed by the Court.

COHEN, GERBER, RUWE, WHALEN, COLVIN, CHIECHI, LARO, GALE, and THORNTON, JJ., agree with the majority opinion.

---

[17]  In its petition, petitioner argues, in the alternative, that most of Clajon's "gas gathering assets may also be properly classified in Asset Guideline Class 49.23" (49.23), which provides a 14-year class life and a 7-year recovery period for "Natural Gas Production Plant".  Rev. Proc. 87-56, 1987-2 C.B. 674, 686.  Petitioner has failed to pursue its alternative argument on brief.  We conclude, therefore, that petitioner has abandoned its alternative argument.  See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001).

WELLS, C.J., dissenting. I respectfully dissent. In the instant case, the majority opinion states that it will follow our opinion in Duke Energy Natural Gas Corp. v. Commissioner, 109 T.C. 416 (1997), which was reversed by the United States Court of Appeals for the Tenth Circuit, 172 F.3d 1255 (10th Cir. 1999). In rejecting the plain language analysis of Rev. Proc. 87-56, 1987-2 C.B. 674 by the Court of Appeals, however, the majority opinion in the instant case does not rely on this Court's rationale in Duke Energy Natural Gas Corp. Rather, the majority injects yet another rationale, based upon its reading of the regulations, to decide that petitioner must depreciate its gathering system using a 15-year recovery period instead of a 7-year recovery period. While I agree with Judge Foley's dissent, I have an additional point I would like to raise. Revenue procedures are published to guide taxpayers, who are permitted to rely on them. We should not read an ownership requirement into Rev. Proc. 87-56, 1987 C.B. 674, where its plain language does not require it.

In section 167(m), Congress delegated respondent broad powers to promulgate regulations to determine the class lives of property used in the natural gas industry. Respondent promulgated regulations pursuant to that authority and indicated that the class guidelines would be published pursuant to that

authority.  Rev. Proc. 87-56 reflects respondent's class-life determinations.

Rather than providing guidance to taxpayers, Rev. Proc. 87-56 has produced considerable confusion and uncertainty.  In <u>Duke Energy Natural Gas Corp. v. Commissioner</u>, <u>supra</u>, this Court and the Court of Appeals for the Tenth Circuit, considered the question before the Court today, and arrived at contrary results. The majority opinion now offers another rationale for its result.

Rev. Proc. 87-56 only requires that assets be "used" by natural gas producers to qualify under section 13.2.  In the instant litigation, respondent asserts that assets must be both "used" and "owned" by natural gas producers.  Revenue procedures are promulgated to provide clear and precise guidance to taxpayers, and I would hold respondent to the plain language of that published guidance.[1]  To require taxpayers to consult a team of tax attorneys to decipher that guidance frustrates the very purpose for which it was issued.

SWIFT, BEGHE, FOLEY, VASQUEZ, and MARVEL, <u>JJ</u>., agree with this dissenting opinion.

---

[1]I note that we have held that the Commissioner may not choose to litigate against an official position the Commissioner has published without first revising or revoking that position. <u>Rauenhorst v. Commissioner</u>, 119 T.C. ___ (Oct. 7, 2002);  <u>Coastal Petroleum Refiners, Inc. v. Commissioner</u>, 94 T.C. 685 (1990); see <u>Phillips v. Commissioner</u>, 88 T.C. 529 (1987), affd. in part and revd. in part 851 F.2d 1492 (D.C. Cir. 1988); see also <u>Slechter v. Commissioner</u>, T.C. Memo. 1987-528.

BEGHE, <u>J</u>., dissenting:  Elementary economic analysis supports the conclusion of Judge Foley, who tried this case, that the gathering system assets in issue are class 13.2 assets "used by * * * producers for * * * production of * * * natural gas" under Rev. Proc. 87-56, 1987-2 C.B. 674, 678.  Petitioner's gathering systems are used for production of natural gas by all the well owners/operators/producers from whose wells originated the gas processed through the systems.  This is true, notwithstanding such producers do not own and operate any gathering system, with most such producers selling to petitioner at the wellhead the bulk of the gas processed through a system[1] and a few other such producers paying petitioner fees for processing their gas through the system.

Back in 1937, R.H. Coase, in the first of the papers for which he was awarded the Nobel Prize in Economics in 1991, "The Nature of the Firm",[2] raised and answered a basic question about the concept of the firm and its boundaries.  Coase explained why businesses exist and operate as they do, why, for instance,

---

[1]Albeit pursuant to contracts under which most such producers and petitioner share the ultimate proceeds of sale to a pipeline company that transports the processed product to public utilities for distribution to consumers.

[2]<u>Economica</u> 4 (Nov. 1937), reprinted in Coase, "The Firm, the Market and the Law" 33 (1988), and Williamson & Winter, Eds., "The Nature of the Firm Origins, Evolution, and Development" 18 (1991).

companies choose to produce some goods or provide some services for themselves and contract with outsiders to provide other goods and services.  Coase explained that relative market prices are not the sole factor; transaction costs also affect the decision. The nature and amount of those costs, Coase theorized, frequently determine whether a company will seek an outside supplier or service provider or itself supply the item or perform the service.[3]  Whatever decision a gas well owner/operator/producer firm makes in any particular case,[4] there is a significant (for

_____

[3]See Easterbrook, "Derivative Securities and Corporate Governance," 69 U. Chi. L. Rev. 729, 729-730 (2002); Tedeschi, "E-Commerce Report," N.Y. Times C12 (Oct. 2, 2000).

[4]A generic description of a range of possibilities similar to those in the case at hand is found in Joskow, "Asset Specificity and the Structure of Vertical Relationships: Empirical Evidence", in Williamson & Winter, Eds., supra note 2 117, 119:

> there is a wide range of institutional arrangements that can be used to govern transactions between economic agents.  Specific institutional arrangements emerge in response to various transactional considerations in order to minimize the total cost of making transactions.  The boundary between a firm and a market provides a very rough distinction between the two primary institutional mechanisms for allocating resources, but this is the beginning, not the end, of the inquiry.  Firms can take on many different organization structures.  Market transactions can take many different forms ranging from simple spot transactions [sale at the wellhead for a fixed price] to complex long-term contracts [various sharing arrangements present in this case and described in Tenth Circuit opinion in Duke Energy II].  The specific set of institutional arrangements chosen would represent the governance structure that minimized the total cost of consummating the transactions of interest.

me, dispositive) economic sense in which any such producer firm uses a gathering system; this is irrespective of whether the producer owns and operates the system itself, or instead, as in the case at hand, sells its gas to petitioner at a fixed price at the wellhead, enters into any one of the various ultimate sale proceeds sharing arrangements with petitioner (also described in Duke Energy Natural Gas Corp. v. Commissioner, 172 F.3d 1255 (10th Cir. 1999), revg. 109 T.C. 416 (1997)), or has its gas processed through petitioner's system for a fee and then sold for the producer's account from the processing plant after the last stage of the productive process has been completed.

As shown by the opinion of the Court of Appeals for the Tenth Circuit in Duke Energy Natural Gas Corp., with which Judge Foley and I agree, the question under Rev. Proc. 87-56, supra, of who a gathering system is "used by" turns neither on who owns the producers or the system, nor on who owns the gas processed through the system. The gathering system is "used by * * * producers for * * * production of * * * natural gas", id., irrespective of the effects on legal ownership and refinements of title of the terms of the contracts they use to have the gas from their wells processed through the system.

FOLEY and VASQUEZ, JJ., agree with this dissenting opinion.

FOLEY, J., dissenting:  I disagree with the majority's analysis and holding.

## I. The Texas Gathering Systems (TGS) Were Production Assets

Revenue Procedure 87-56 states that asset class 13.2 includes "assets used by * * * natural gas producers for * * * production of * * * natural gas, including gathering pipelines". As the trial judge I concluded, after analyzing all of the relevant evidence and testimony, that Clajon's pipelines were gathering systems "used by" producers in the production of natural gas.  Gathering systems are essential to the production process because they treat unprocessed natural gas by removing water, hydrogen sulfide, and carbon dioxide.[1]  Without dehydration and treatment, the gas cannot be used, and transmission companies would not accept it for transportation to ultimate consumers.  Indeed, without a properly designed gathering system the gas would never be produced at all but would simply remain in the ground.  Thus, the services provided by Clajon were an integral part of the production process.

---

[1]  Pipes in a gathering system, generally, deteriorate faster and have to be replaced more frequently than long-distance transmission pipelines.  Because gathering system pipes have shorter physical lives than transmission pipelines, it is reasonable to conclude that Clajon's gathering systems are within the asset class with the shorter recovery period.

## II. The Plain Meaning of Asset Class 13.2 Controls

I agree with the analysis and conclusion of the Court of Appeals for the Tenth Circuit in reversing Duke Energy Natural Gas Corp. v. Commissioner, 109 T.C. 416 (1997) (Duke Energy I), revd. 172 F.3d 1255 (10th Cir. 1999) (Duke Energy II).  The Court of Appeals correctly refused to incorporate an ownership requirement into the phrase "used by" in asset class 13.2.  Id. The court stated:  "The literal terms of [asset class 13.2] include any gathering system, so long as it is used by a gas producer."  Id. at 1259.  Contrary to our opinion in Duke Energy I, the Court of Appeals concluded that gathering systems owned by a nonproducer were "'used by' producers through contractual arrangements".  Id.  Our holding in Duke Energy I should be overruled.

The central issue is whether the gathering systems were "used by" producers.  Absent some ambiguity, the plain meaning of a statute or regulation controls its interpretation.  "Use" is not a difficult word to interpret or understand.  See Black's Law Dictionary 1541 (6th ed. 1990) (defining "use" as follows:  "to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end").  The majority's holding that the gathering system must be owned by

natural gas producers is contrary to the common understanding of the phrase "used by".

The majority acknowledge that the decision of the Court of Appeals was based on the plain language of asset class 13.2 (i.e., the phrase "used by * * * natural gas producers"). See majority op. p. 13. The majority, however, fail to analyze this language or present any cogent reasons why we should not strictly adhere to it. Without first finding that the language of asset class 13.2 is ambiguous, the majority begin their analysis of respondent's revenue procedures using "historical material" to conclude that Asset Depreciation Range classes were designed to encompass industries and entities rather than assets. See majority op. p. 11. Historical development, like legislative history, is a far less accurate embodiment of intent than plain language and is susceptible to a wide array of interpretations. Only after this historical analysis do the majority turn to the plain meaning. Even then, a plain meaning analysis is applied only to asset class 46.2.

III. The Majority Misinterpret the Primary Use Doctrine

Before Clajon purchased the Southeast Texas Pipeline System (SETPS) (i.e., the largest of the six systems), it is indisputable that this system was used primarily by natural gas producers in the production process. Clajon continued to operate the SETPS without changing the system's primary use. The

producers connected to the TGS needed a gathering system to further the production process by removing impurities and delivering their gas to processing facilities.  Indeed, all of the producers connected to the TGS had contractual agreements to, and did in fact, "use" Clajon's gathering systems.  Even in contracts where title passed to Clajon, the gathering system remained the means by which the producers' gas ultimately traveled to the gas processing plant and transmission lines. Contrary to the majority's holding, the primary use of the TGS was the same regardless of who owned the systems or the gas flowing through the systems.

The majority base their holding on the theory that the availability of all asset classes depends on the primary use of the taxpayer rather than the primary use of the asset.  This is, essentially, an ownership requirement.  Such a theory is inconsistent with the law.  Section 1.167(a)-11(b)(4)(iii)(b), Income Tax Regs., states that "Property shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities."  This regulation unequivocally states that, regardless of the taxpayer's activities, the primary use of the asset determines the appropriate asset class for purposes of depreciation.

The majority interpret section 1.167(a)-11(b)(4)(iii)(<u>b</u>), Income Tax Regs., <u>as if</u> it read that the property shall be classified according to the "taxpayer's primary use". See majority op. p. 19 (emphasis added). We, however, must take the law as we find it. The regulation specifically states that our focus is the <u>property's</u> primary use. Moreover, the language of asset class 13.2 requires only that the asset be "used by" a natural gas producer in the production of natural gas. Clajon's gathering systems meet the requirement even though Clajon was not a producer.

IV. <u>Conclusion</u>

The plain language of asset class 13.2 does not require that a gathering system be "owned by" a natural gas producer to be included in that asset class. While respondent is free to issue revised guidance, Rev. Proc. 87-56 simply requires that a gathering system be "used by * * * a natural gas producer" in order to fall within asset class 13.2. The TGS is so used. Accordingly, the majority's conclusion is incorrect, and petitioner is entitled to recover the cost of the gathering systems over a 7-year period.

WELLS, SWIFT, BEGHE, VASQUEZ, and MARVEL, <u>JJ</u>., agree with this dissenting opinion.