The SOUTHLAND CORPORATION

v.

The UNITED STATES.

No. 487–76.

United States Court of Claims.

Dec. 12, 1979.

Stanley C. Simon, Dallas, Tex., attorney of record, for plaintiff. Carol Buehrens, Washington, D. C., and Simon & Twombly, Dallas, Tex., of counsel.

James S. Maxwell, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA, and SMITH, Judges.

## OPINION

KASHIWA, Judge.

This is an action for recovery of an alleged overpayment by plaintiff of federal corporate income taxes in the amounts of $30.49 and $7,475.61 for the years 1970 and 1971 respectively, plus assessed and statutory interest thereon. The case was heard before a trial judge. The trial judge held certain of plaintiff's property was not tangible personal property under Internal Revenue Code section 48 [1] and therefore ineligible for the section 38 investment tax credit. [2] Plaintiff has excepted to the trial judge's findings and conclusions. For the reasons stated below, we reverse the trial judge and hold for plaintiff.

Plaintiff operates convenience stores under the familiar "7–Eleven" name. During the years in issue, 1970 and 1971, plaintiff erected 132 "pole signs" in front of its stores. A pole sign consists in part of a steel tube that is 20 feet long, is either round or square in shape, and is 8 inches in diameter. The walls of the tube are ¼ inch thick. The tube is set 6 feet below ground level in a concrete foundation. On each of the poles installed in 1970 and 1971, the concrete extended 2½ feet above ground level and served as a bumper to protect the pole. Atop the pole, a sign head is mounted with four bolts. The sign faces are then attached to the sign head. The faces were of two different sizes—Model 40 is 5 feet 7 inches by 7 feet 1 inch, Model 80 is 8 feet 2½ inches by 10 feet 3¼ inches. The head, faces, pole, foundation, concrete and cost of installation are collectively called a pole sign.

With respect to the pole signs erected in 1970 and 1971, a typical head cost about $600, a typical pole cost about $200, and a typical installation, including the concrete and reinforcing material, cost about $320. Thus a typical pole sign erected in the years in issue cost plaintiff about $1,120.

A pole sign has a useful life of 5 years, on the average.

Of the 132 pole signs, 38 were located on land owned by plaintiff, and 94 on land owned by others and leased to plaintiff. At the time of installation on leased property, all but one of the leases had a remaining unexpired lease term longer than the useful life of the pole signs located on leased property. None of the leases contained an express written obligation on the part of plaintiff to remove the pole sign upon the expiration of the term of the lease nor empowered the lessor to require summary removal of the pole sign. All the leases provided that pole signs erected on leased lands remained the property of, and could be removed by, plaintiff.

Although plaintiff expected all its stores to be successful, management could not be omniscient and a certain percentage of stores were closed. Of the total number of new stores opened plus stores acquired prior to 1970, 9 percent had been closed by the end of 1969. Of the number opened and acquired prior to 1971, 12 percent had closed by the end of 1970. [3]

When plaintiff closes a store, it has the pole sign removed. This is usually done by two men, with a crane. The sign head, with the face still attached, is unbolted and lifted off. There are two methods of removing the pole. The first is to cut the

---

1. All statutory references are to the Internal Revenue Code of 1954, as amended.

2. Section 38 as material herein reads as follows:

"Sec. 38. Investment in certain depreciable property.

"(a) General rule.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part."

3. Prior to January 1, 1970, Southland opened 3,185 new stores and acquired 596 pre-existing stores. It closed 346 stores during this period. The closure rate was thus 9 percent (346/[3,185 + 596]).

Prior to January 1, 1971, Southland opened 3,433 new stores and acquired 666 pre-existing stores. It closed 485 stores during this period. The closure rate was thus 12 percent (485/[3,433 + 666]).

pole off at the top of the concrete bumper. If this is done, total removal time is from 2½ hours to 3 hours and total cost is from $100 to $150. The other is to, with a jackhammer, remove the concrete bumper and possibly a small part of the foundation. The pole is then severed at or below ground level. The small, resulting hole is then filled with Sakrete or concrete, leaving a smooth surface at ground level. Breaking the bumper and pouring Sakrete or concrete adds about 2 hours to the time involved and total cost is from $225 to $250. In all cases, an acetylene torch is used to cut the pole. Regardless of method of removal, the concrete foundation and portion of pole embedded in it are never removed. They are left in the ground.

To the extent the sign head, faces and pole are in good condition, they are reused at new stores. In the case of the pole, another length of tube is welded on the bottom to replace the portion cut off and left at the former location.

Plaintiff claimed a section 38 investment credit for these pole signs. The Internal Revenue Service determined plaintiff was not entitled to this credit, and deficiency assessments were thereupon made and collected. Timely claims for refund were filed and formally rejected. More than 6 months have elapsed since the filing of these claims.

The precise issue is whether any or all of these 132 pole signs, or subcomponents thereof, are "tangible personal property" within the meaning of section 48(a)(1)(A).[4] To the extent they are, the claiming of the section 38 credit was proper and plaintiff is entitled to recover.

■ Tangible personal property is not defined in the Code itself. However, Treas. Reg. § 1.48–1(c) states that it is "any tangible property except land and improvements thereto, such as buildings or other inherent-

ly permanent structures." Since these pole signs are tangible property and are obviously not "land," if they are not "improvements," they must be tangible personal property. "[T]he common characteristic which is attributed to improvements is that they are 'inherently permanent structures.'" *Whiteco Industries, Inc. v. Commissioner,* 65 T.C. 664, 671 (1975). We are therefore concerned with the extent, if any, that these pole signs are inherently permanent structures. Two prior decisions of this court, *Alabama Displays, Inc. v. United States,* 507 F.2d 844, 205 Ct.Cl. 716 (1974), and *National Advertising Co. v. United States,* 507 F.2d 850, 205 Ct.Cl. 728 (1974), examined the meaning of "inherently permanent structures" in the context of advertising displays. *Whiteco,* a recent Tax Court opinion, also dealt with this very question.

The displays in *Alabama* and most of those in *National* were outdoor billboards on which advertising information was affixed, mounted on top of a steel or wood structure. Some of these billboard supports were embedded in concrete. Plaintiff's signs also served to advertise, and were mounted on top of a steel pole embedded in concrete. The only difference is the displays in *Alabama* and *National* did not advertise those plaintiffs' products—they advertised their customers' products. These pole signs advertise Southland's own products. This, however is a difference without legal significance. There being no legal distinction between these pole signs and the advertising displays in *Alabama* and *National,* what we said there is equally applicable to the present case.[5]

In *Alabama* and *National,* each advertising display was analyzed as a unit. The sign face, supporting structure and cost of installation were treated as a single asset. We did not look to see whether the subcom-

---

**4.** Section 48(a)(1)(A) as material herein reads as follows:

"Sec. 48. Definitions; special rules.

"(a) Section 38 property.—

(1) In general.—Except as provided in this subsection, the term 'section 38 property' means—

(A) tangible personal property * * *."

**5.** *Whiteco* also dealt with outdoor advertising displays. These advertised the products of Whiteco's customers. From a functional standpoint, this is the only difference between those signs and Southland's pole signs.

ponents considered separately were inherently permanent.[6] In deciding whether this single asset was an inherently permanent structure, we set out a number of factors to look to.

We first inquired whether the property was readily removable. How substantial a job was removal of the property; how many man hours were required? The Tax Court agrees this is a proper factor.[7]

We were also concerned with whether the property could be readily reused after being removed. In *Alabama*, we spoke of the floating docks present in *Morgan v. Commissioner*, 52 T.C. 478 (1969), *aff'd per curiam*, 448 F.2d 1397 (9th Cir. 1971). We felt it significant that the docks, once moved, could be immediately reused. Once the billboards in *Alabama* were removed, the salvageable parts were reused whenever practical.

Amount of wastage was also an area of inquiry. If the property was removed, how much of it was wasted? How much of it was left in the ground? Some of the wood and steel posts in *Alabama* and *National* were embedded in concrete. When the billboards were removed, the portion of the post below ground level, as well as the concrete surrounding it, was always left in the ground.[8] *Whiteco* factor number five,

though not identical, is similar. 65 T.C. at 673.

We also considered whether, measured at the time the property was affixed to the land, there was an objectively ascertainable likelihood that the property might or would be removed before the expiration of its useful life.[9] *Alabama* discussed the fact that the billboards were on leased property, that the lessor had the right to force their removal, that the lessee had the legal right to remove the signs and that signs had been regularly moved in the past. The significance of these facts was they were objective evidence of a likelihood that the signs might or would be removed prior to expiration of their useful lives.[10] Ownership of the land on which the signs were located and right of summary removal were not meant themselves to be decisive factors. Such an interpretation is to give a narrow reading to *Alabama* and would ignore our mandate of liberal construction.[11] The third *Whiteco* factor is virtually identical to this factor.[12]

Two men with a crane can remove the pole sign in a total of 5 to 6 man-hours if the bumper is left in place, or about 9 or 10 man-hours if the bumper is removed. In addition, only one pole supports the Assembly, and it can be easily severed with an acetylene torch. Although not clear from

6. When faced with this same issue, the Tax Court in *Whiteco* also treated the sign face, supporting structure and cost of installation as a single asset.

7. The fourth *Whiteco* criterion is similar to this factor. 65 T.C. at 673.

8. Without stating what the maximum permissible amount of wastage is, the amounts in *Alabama* and *National* were small enough to not make those advertising displays inherently permanent structures.

9. To this extent, we agree with the trial judge's opinion. The time of installation "is the critical time for determining whether the pole sign is or is not 'tangible personal property' for investment credit purposes." Treas.Reg. § 1.48–1(a).

10. The Tax Court also placed significance on whether the property in question has been moved in the past. *Whiteco Indus., Inc. v. Commissioner, supra* at 672 (first criterion). We, however, only view it as evidence of a

deciding factor. That court treats this past movement as itself being a factor.

11. "[W]ith relation to the question of whether structures are inherently permanent improvements, the provision [section 48] must be liberally construed * * *." *Alabama Displays, Inc. v. United States*, 507 F.2d at 848, 205 Ct.Cl. at 724.

12. *Whiteco* looked to whether there are "circumstances which tend to show that the property may or will *have* to be moved." 65 T.C. at 672 (emphasis supplied). The presence of "have" shows that court was focusing on legally imposed circumstances—such as lessor exercising a right of summary removal. Our fourth factor, though being sometimes evidenced by legal relations, is not to be so narrowly construed. Economic factors and the sign owner's normal business practices can also indicate a likelihood of removal.

our opinions, more man-hours were required for removal of the signs in *Alabama* and *National.* Those signs were supported by longer poles and steel beams, there were generally more than one per sign and the sign face was generally larger than these faces. In relation to our prior two cases, these pole signs are readily removable.[13]

When a pole sign is removed, if the head, face or pole are in good condition they are reused. The head and face require no re-working to prepare them for reinstallation. All that need be done to the pole is weld a new section on. After being removed, the pole sign can be readily reused.[14]

If the bumper and the portion of pole encased in it, is left in place, 8½ feet of pole is non-reusable. If the bumper is broken off and the pole cut at ground level, 6 feet is wasted. In both cases, none of the concrete is reusable. The full cost of installation is also lost. This is the portion of the pole sign which is wasted when removal occurs. In *Alabama,* when a pole embedded in concrete was removed, the pole was cut off at ground level. The portion of pole embedded in concrete, as well as the concrete itself, was wasted. Depending on the type of sign, between 3 and 10 feet would be lost per pole, and each sign was composed of a number of poles. The wastage here is certainly no greater than that in *Alabama.*[15]

As discussed above, plaintiff's pre-1970 store closure rate was 9 percent and its pre-1971 rate 12 percent. When plaintiff installed pole signs in 1970 and 1971, it therefore knew there was a likelihood that the stores to which the signs were accessory might be closed. If a store closed, it was Southland's consistent business practice to remove the accompanying pole sign. This meant that at the time of installation, there was an objectively ascertainable likelihood that at least some of these pole signs would be removed before the expiration of their useful lives.

It is true as the trial judge pointed out that

> * * * when the plaintiff establishes a 7–Eleven store and erects a related pole sign * * * the plaintiff expects the store to be successful; and the pole sign is erected with the intention and expectation on the part of the plaintiff that the pole sign will be there permanently throughout its useful life.

However, regardless of how much Southland intended and expected a store to succeed, it knew that no matter how carefully it planned, a significant percentage of stores would fail. Its hopes of store success thus do not negate the likelihood of early removal.

None of plaintiff's leases required it to remove the pole signs on expiration of the lease term. It logically follows that plaintiff was not required to remove the pole sign when a store located on leased land was closed. When Southland closed a store located on its own land, it was not legally required to remove the pole sign. The Government would attach significance to plaintiff's lack of legal obligation to remove the pole signs when it closed stores. Such importance is misplaced. We are focusing on the likelihood of removal and, as pointed out *supra* note 12, economic factors and normal business practice as well as legal obligations are all relevant evidence. On

**13.** Measured against the signs in *Whiteco,* Southland's pole signs should satisfy the Tax Court's fourth criterion. The signs owned by Whiteco, being generally larger and supported by more poles than these pole signs, probably were less readily removable than Southland's signs. While the Tax Court spoke of a removal time of 1½ hours, this was for the poles alone and we aren't told how many men were involved. Total man-hours required for removal of an entire display was thus probably more than that needed for these pole signs.

**14.** Once a pole sign is removed, the head, face and pole may not necessarily be reinstalled at the same new location. They may be used at different locations as the need for pole sign components arises. This, however, does not detract from the fact that the pole sign, considered as a single unit, is readily reusable.

**15.** The wastage is also no greater than in *Whiteco.* When Whiteco outdoor displays were moved, the portion of pole surrounded by concrete, the concrete itself and the cost of installation were also non-reusable.

our facts, what is crucial is that on closing a store, plaintiff's normal business practice was to remove the entire pole sign. Whether it had the legal obligation to do so is beside the point.

It is true that, except in one case, plaintiff either owned the land on which the pole signs were placed or leased the land for a term in excess of the pole signs' useful lives. In addition, none of the leases gave the lessor the legal right to force Southland to remove its signs prior to expiration of the lease. Plaintiff could therefore leave all its signs, except one, in place for their entire useful lives. While this is certainly to be considered in deciding whether there was a likelihood of removal, we feel the store closure rate is more significant. To do otherwise would be to ignore the fact that plaintiff knew stores would be closed and the pole signs removed. Plaintiff's legal right to leave the pole signs in place does not detract from the likelihood of early removal.[16]

■ Applying these *Alabama* factors to the present case, the pole signs, each treated as a single asset, are not inherently permanent structures.[17] These pole signs satisfy our requirements to at least the same degree as the outdoor advertising displays present in *Alabama* and *National.* Since the common characteristic of improvements is that they are inherently permanent structures, *Whiteco Industries, Inc. v. Commissioner, supra* at 671, the pole signs are not improvements to land. Relying on the definition of tangible personal property contained in Treas.Reg. § 1.48–1(c), it is our opinion that these pole signs are tangible personal property.[18]

This conclusion makes it unnecessary to analyze the face, head, pole, concrete and cost of installation separately to see whether any of these treated individually are inherently permanent. We are also not required to reach plaintiff's argument that section 1033(g)(3) (section 1033(f)(3) for taxable years beginning prior to January 1, 1975) and the Senate Finance Committee Report on the Revenue Act of 1978 (S.Rep. No. 95–1263, 95th Cong., 2d Sess. 117 (1978) U.S.Code Cong. & Admin.News 1978, p. 6761) indicate that outdoor advertising structures, such as its pole signs, are tangible personal property.

The trial judge's contrary holding was based on a misreading of *Alabama* and not on a finding that the above four factors were not met. In his view, the critical *Alabama* criteria were:

(1) The billboards were located in other person's properties, the billboard sites having been leased from the landowners.

(2) There was an express written obligation on the part of the lessee to remove the billboards upon the termination of the leases.

(3) By giving appropriate notice * * a lessor could terminate a lease and require the removal of a billboard at any time.

(4) Under the provisions of the leases, the billboards remained at all times the property of the lessee.

(5) The billboards were not inherently permanent structures and did. not otherwise improve the land on which they were located.

As earlier discussed, the first four criteria listed by the trial judge were not meant to

---

**16.** If only a legally imposed circumstance will satisfy the Tax Court's third *Whiteco* factor, then on our facts this factor would not be met. However, to the extent such factor is based on *Alabama*, it is a narrow reading and ignores our mandate of liberal construction.

**17.** On our reading of *Whiteco*, we do not know how the Tax Court would hold. Its first, fourth, fifth and sixth factors are clearly met. The second should also be satisfied—due to these pole signs having the same useful life as Whiteco's billboards. It is the third *Whiteco*

factor which may not be met, *see supra* note 16, and we do not know how significant this would be.

**18.** Without passing on its significance, we note that any other conclusion would have produced anomalous results. Plaintiff mounted nearly identical advertising signs on its stores. These serve the same advertising function as the pole signs. Under Treas.Reg. § 1.48–1(c), the building mounted signs are clearly tangible personal property.

be deciding factors. They all went to the question of likelihood of early removal of the advertising displays present in *Alabama*. The fifth is not truly a factor—it is a restatement of what we were there seeking to ascertain. To state it as a factor is to assume that which is to be proven. However, with regard to his fifth criterion, the trial judge made certain remarks which need to be discussed.

Talking about the pole signs located on plaintiff's own land, these were found to be improvements to land for the following reason:

> * * * [T]he evidence in the record shows that the erection of a pole sign attracts customers to, and increases the business of, the nearby 7–Eleven store. Thus, a pole sign in combination with a 7–Eleven store on land owned by the plaintiff undoubtedly conferred an economic benefit on, increased the value of, and constituted an improvement to the particular parcel of land.

With regard to pole signs on leased property, it was pointed out that "the pole signs added to the value of, and represented an improvement to, the plaintiff's leasehold interests in the lands."

This first quoted passage indicates that an asset which increases the level of business done by a person, and thus confers an economic benefit on him, must be an improvement to the land on which that business is conducted. This does not logically follow. Improving the level of business conducted on the land does not, of itself, make the asset an improvement to the land on which the business is carried on. A portable sign mounted on a trailer and placed in front of one of plaintiff's stores would also increase that store's level of business. Yet no one would contend that such a sign is an improvement to the land within the meaning of Treas.Reg. § 1.48–1(c). Conferral of economic benefit should therefore not be a factor in deciding whether the asset is an improvement.[19]

Nor does it follow that an asset's increasing the value of the land makes it an improvement to land. The second quoted passage indicates that an asset placed on land, if it increases the value of that land, must be an improvement. Such an assumption proves too much and is therefore not an appropriate factor. Whenever an asset is placed on land, assuming the asset has value, the land and asset considered together will always be worth more than the land without the asset on it.

## CONCLUSION OF LAW

Upon the foregoing opinion, the facts as stipulated by the parties, the briefs and oral argument of counsel, the court concludes as a matter of law that the plaintiff is entitled to recover its overpayments for 1970 and 1971, plus assessed and statutory interest, and judgment is entered to that effect. The amount of recovery will be determined by subsequent proceedings pursuant to Rule 131(c).

---

**19.** It is implicit in Treas.Reg. § 1.48–1(c) that a sign's bestowing an economic benefit on the business does not make the sign an improvement to land. A sign attached to a building is there classified as tangible personal property, which means it is not an improvement. Yet such a sign, if advertising the business conducted by the store on which it is mounted, could confer as much benefit as these 7–Eleven pole signs.