PPL Corporation & Subsidiaries, Petitioner *v.*
Commissioner of Internal Revenue,
Respondent

Docket No. 25393–07.          Filed July 28, 2010.

P's subsdiary (S) is an operating electric utility engaged in the generation, transmission, and distribution of electricity. It provides various lighting services (e.g., street lighting) for public and private entities. Street light assets include the light fixtures, hardware to mount the fixtures, various types of poles, and wires. The parties dispute the length in years of the recovery period that S must use to calculate its annual depreciation deduction for street light assets. *Held*: Street light assets are neither assets used in the distribution of electricity for sale nor land improvements. Thus, street light assets do not fall within asset class 49.14, Electric Utility Transmission and Distribution Plant (with a recovery period of 20 years), or asset class 00.3, Land Improvements (with a recovery period of 15 years), specified in Rev. Proc. 87–56, 1987–2 C.B. 674. Rather, street light assets are property without a class life, classified as "7-year property" (with a recovery period of 7 years) pursuant to sec. 168(e)(3)(C)(ii), I.R.C. (1997).

*Richard E. May*, *Mark B. Bierbower*, and *Timothy L. Jacobs*, for petitioner.

*Melissa D. Arndt*, *Allan E. Lang*, *Michael C. Prindible*, and *R. Scott Shieldes*, for respondent.

Halpern, *Judge*: PPL Corp. (petitioner) is the common parent of an affiliated group of corporations (the group or affiliated group) making a consolidated return of income. By notice of deficiency (the notice), respondent determined a deficiency of $10,196,874 in the group's Federal income tax

176

for its 1997 taxable (calendar) year and also denied a claim for refund of $786,804. The issues for decision are whether respondent properly (1) denied the claim for the refund, which is related to the creditability of the United Kingdom (U.K.) windfall tax paid by petitioner's indirect U.K. subsidiary, (2) included as dividend income a distribution that petitioner received from the same indirect U.K. subsidiary, but which, within a few days, the subsidiary rescinded and petitioner repaid, and (3) denied depreciation deductions that petitioner's U.S. subsidiary claimed for street and area lighting assets (the street light issue). We shall address the third issue in this report. A forthcoming report will address the first two issues.

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

*Stipulations*

The parties have entered into a first, second, and third stipulation of facts. The facts stipulated are so found. The stipulations, with accompanying exhibits, are incorporated herein by this reference.

*Petitioner's Business*

Petitioner is a Pennsylvania corporation that was known during 1997 as PP&L Resources, Inc. It is a global energy company. Through its subsidiaries, it produces electricity, sells wholesale and retail electricity, and delivers electricity to customers. It provides energy services in the United States (in the Mid-Atlantic and Northeast) and in the United Kingdom.

*PP&L*

During 1997, Pennsylvania Power & Light Co., also a Pennsylvania corporation, was petitioner's direct subsidiary. On September 12, 1997, Pennsylvania Power & Light Co. changed its name to PP&L, Inc. (Hereinafter, we shall refer to that corporation, both before and after it changed its

name, as PP&L.) During 1997, PP&L was the operating electric utility company for the affiliated group and was engaged in the generation, transmission, and distribution of electricity. During that year, PP&L was petitioner's principal subsidiary, with approximately 96 percent of the assets of petitioner's affiliated group.

*Electricity Basics: Concepts and Definitions*

Electricity is the flow of electric current. The rate of that flow is measured in amperes (or amps). The pressure that causes electricity to flow (voltage) is measured in volts. Resistance to the flow of electricity is measured in ohms.

The combination of electromotive force (volts) and current (amperes) is the rate of work being done, measured in watts. One thousand watts are a kilowatt. If the rate of work is one kilowatt and that rate lasts an hour, then one kilowatt-hour of work is completed. The quantity of electricity used is commonly measured in kilowatt-hours.

*The Delivery of Electricity*

There are three distinct stages in delivering electricity: generation, transmission, and distribution. Generation is the process of producing electricity. Transmission is the process of moving high voltage electricity from power plants to distribution substations. Distribution is the process of moving lower voltage electricity from distribution substations to customers.

Distribution begins at the distribution substation, where transformers decrease the voltage of the incoming electricity. The outgoing electricity flows through primary distribution lines to distribution transformers, which further reduce its voltage. The electricity then flows through secondary distribution lines to service drops, street and highway lights, nonroadway lights, and traffic signals. A service drop is the connection between a secondary distribution line and a customer. A meter at the end of the service drop measures the electricity the customer uses, typically in kilowatt-hours.

*Street Light Assets*

During 1997, and at other relevant times, PP&L provided street and highway lighting (street lighting) and nonroadway

lighting (area lighting) for public and private entities. We refer to the equipment used to provide street and area lighting as street light assets. Street light assets include the light fixtures (luminaires); the mast arms or brackets (used to mount the luminaires on wood poles or other structures); aluminum, steel, and fiberglass poles; and wires.

Luminaires are generally mounted on (1) wood poles (which might also support secondary distribution lines, service drops, and distribution transformers attached to primary distribution lines), (2) aluminum, steel, or boulevard fiberglass poles connected underground to distribution transformers, (3) nonboulevard fiberglass poles, and (4) buildings, bridges, tunnels, and underpasses.[1] Wood poles are part of the distribution system.

Street light assets convert electricity into light and can be disconnected from the distribution system without affecting any other part of that system.

In 1997, PP&L charged for street and area lighting services but did not actively market or advertise those services.

*Tax Accounting*

In December 1997, PP&L filed Form 3115, Application for Change in Accounting Method, making an automatic method change under Rev. Proc. 96–31, 1996–1 C.B. 714. In that Form 3115, PP&L reclassified its street light assets, removing them from asset class 49.14, Electric Utility Transmission and Distribution Plant, and classifying them as property without a class life. See Rev. Proc. 87–56, 1987–2 C.B. 674, 675, 685.[2] As a result of that reclassification, for PP&L's street light assets placed in service before 1997, petitioner claimed a negative adjustment to its 1997 taxable income under section 481(a) of $18,606,135. Consistent with that reclassification, PP&L classified street light assets it placed in service in 1997 as property without a class life.

In the notice, respondent disallowed both the $18,606,135 negative adjustment to petitioner's 1997 taxable income and $1,476,120 of tax depreciation for 1997 attributable to

---

[1] Boulevard fiberglass poles (like aluminum and steel poles) are bolted to their foundations, whereas nonboulevard fiberglass poles are embedded approximately 5 feet in the ground and backfilled with cement, stone, and tamped earth. The distinction between boulevard fiberglass poles and nonboulevard fiberglass poles is relevant only to our discussion of whether street light assets are land improvements. See sec. V. of this report.

[2] We discuss the applicable statutory and regulatory framework in sec. II. of this report.

the classification of PP&L's street light assets as property without a class life rather than as property described in asset class 49.14.

OPINION

## I. *Introduction*

The parties dispute the length in years of the recovery period that petitioner must use to calculate its annual depreciation deductions for street light assets. Respondent argues that the proper recovery period for those assets is 20 years; in the alternative, he argues that it is 15 years. Petitioner argues that it is 7 years. We agree with petitioner.

## II. *Statutory and Administrative Provisions*

Section 167(a) permits as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business. For tangible property, section 168(a) provides that the depreciation deduction of section 167(a) is determined by using the applicable depreciation method, recovery period, and convention.

Only the applicable recovery period is in issue. Under section 168(c) and (e), the classification of tangible property determines its recovery period. Section 168(i)(1) defines "class life" as that "which would be applicable with respect to any property as of January 1, 1986, under subsection (m) of section 167". Repealed in 1990, section 167(m) provided for depreciation according to "the class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class property to the industry or other group." Essentially, section 167(m) codified the Asset Depreciation Range system described in section 1.167(a)–11, Income Tax Regs., and in particular the system of asset guideline classes and periods (sometimes, class lives) found therein. See H. Rept. 92–533, at 30–35 (1971), 1972–1 C.B. 498, 514–516; S. Rept. 92–437, at 45–52 (1971), 1972–1 C.B. 559, 584–588.

Section 167(m) confirmed the Secretary's authority to prescribe class lives. Accordingly, section 1.167(a)–11(b)(4)(ii), Income Tax Regs., states: "Asset guideline classes and periods * * * [will] be established, supplemented, and revised * * *, and will be published in the Internal Revenue

Bulletin." The regulation refers to Rev. Proc. 72–10, 1972–1 C.B. 721, as setting forth the applicable "asset guideline classes". See sec. 1.167(a)–11(b)(4)(ii), Income Tax Regs. Rev. Proc. 72–10, *supra*, was the first of several revenue procedures establishing asset guideline classes, each superseding its predecessor and culminating in Rev. Proc. 87–56, *supra*. Rev. Proc. 87–56, *supra*, established the asset guideline classes in effect for purposes of this case.[3]

The specific asset guideline classes in issue are asset class 49.14, Electric Utility Transmission and Distribution Plant, and asset class 00.3, Land Improvements. The former includes "assets used in the * * * distribution of electricity for sale", *id.*, 1987–2 C.B. at 685; the latter includes "improvements directly to or added to land", *id.*, 1987–2 C.B. at 677. If placed in service after December 31, 1986, assets in asset class 49.14 have a recovery period of 20 years, *id.*, 1987–2 C.B. at 685, and assets in asset class 00.3 have a recovery period of 15 years, *id.*, 1987–2 C.B. at 677. Property without a class life and not otherwise classified under section 168(e)(2) and (3) is "7-year property". Sec. 168(e)(3)(C)(ii); Rev. Proc. 87–56, 1987–2 C.B. at 675. We sometimes refer to property without a class life as being in the residual class. The recovery period for 7-year property is 7 years. Sec. 168(c)(1).

Section 1.167(a)–11(b)(4)(iii)(*b*), Income Tax Regs., provides that

property shall be included in the asset guideline class for the activity in which the property is primarily used. * * * Property shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities. * * *

III. *The Positions of the Parties*

We must first find whether street light assets are "primarily used", see sec. 1.167(a)–11(b)(4)(iii)(*b*), Income Tax Regs., in the "distribution of electricity for sale" and so properly classified under asset class 49.14, see Rev. Proc. 87–56, 1987–2 C.B. at 685. If they are not, then we must find whether they are land improvements under asset class 00.3.

---

[3] Congress revoked the authority of the Secretary to prescribe new class lives in the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, sec. 6253, 102 Stat. 3753.

See *id.*, 1987–2 C.B. at 677. Respondent argues that street light assets fall within asset class 49.14; in the alternative, he argues that they fall within asset class 00.3. Petitioner argues that they fall within neither. First, we find that street light assets are not used in the distribution of electricity for sale.[4] Second, we find that they are not land improvements. Our analysis follows.

## IV. *The Distribution of Electricity for Sale*

### A. *Introduction*

Petitioner bears the burden of proof, see Rule 142(a), and has carried that burden. Street light assets are "primarily used" to make light, not to distribute electricity. See sec. 1.167(a)–11(b)(4)(iii)(*b*), Income Tax Regs. Moreover, that the activity of making light is insubstantial in relation to all petitioner's activities is irrelevant. See *id.* We thus find that street light assets are not used in the distribution of electricity for sale.[5]

### B. *Respondent's Arguments*

Respondent makes six arguments to the contrary, which we shall address in turn.

#### 1. *The Distribution and the Sale of Electricity*

Respondent argues that, under a plain reading of the statute, the regulations, and Treasury guidance, street light assets are used both in the distribution of electricity and in the sale of electricity. For that reason, notwithstanding that street light assets convert electricity to light, respondent con-

---

[4] The parties bifurcate their analyses of asset class 49.14, considering the question of the distribution of electricity separately from the question of the sale of electricity. We are not convinced, however, that the analysis involves two distinct questions.

[5] To be clear, we find that *no one* uses street light assets in the distribution of electricity for sale. For that reason, we need not reconsider our holding in *Clajon Gas Co., L.P. v. Commissioner*, 119 T.C. 197 (2002) (Clajon I), revd. 354 F.3d 786 (8th Cir. 2004) (Clajon II), and *Duke Energy Natural Gas Corp. v. Commissioner*, 109 T.C. 416 (1997) (Duke Energy I), revd. 172 F.3d 1255 (10th Cir. 1999) (Duke Energy II). Those cases involved essentially the same fact pattern; the taxpayer, the owner of gathering pipelines, transported natural gas under contract to operators of processing plants and transmission lines. Clajon I, 119 T.C. at 199–200; Duke Energy I, 109 T.C. at 417–418. In determining the proper asset guideline class for the gathering pipelines, we focused on the taxpayer's use of those assets. Clajon I, 119 T.C. at 207–213; Duke Energy I, 109 T.C. at 421. The Courts of Appeals, however, focused on their use in the industry. Clajon II, 354 F.3d at 789–790; Duke Energy II, 172 F.3d at 1258–1259. Because we find that no one—not petitioner, not any municipality—uses street light assets primarily for the distribution of electricity for sale, we need not today address those conflicting approaches.

cludes that street light assets are used in the distribution of electricity for sale.

a. *The Distribution of Electricity*

Respondent states that, because street and area lighting is an electric service and because "a distribution system will typically include all assets used to provide electric services", street light assets are part of the distribution system. That argument relies completely on the statement that "a distribution system will typically include all assets used to provide electric services", which respondent neither explains nor supports. For the following reasons, we are not convinced.

The parties stipulated that distribution is "the delivery of electric energy to customers" and "the final utility step in the provision of electric service to customers". That is consistent with a standard definition of distribution as "the process by which commodities get to final consumers". Webster's Fourth New World College Dictionary 418 (2007). We find that definition apposite and, well, illuminating. The distribution of electricity seems to us to be the process by which electricity (the commodity) gets to final consumers.[6] Respondent compares street light assets to service drops (the connection between a secondary distribution line and a customer). Yet service drops are fundamentally different from street light assets. Service drops are a part—the final part—of the distribution of electricity, for the simple reason that service drops facilitate the process by which electricity gets to final consumers. In contrast, whereas service drops get final consumers electricity, street light assets get them light.[7]

Respondent, in the end, seems to suggest that simply because street light assets are connected to the distribution

---

[6] The Edison Electric Institute Glossary of Electric Industry Terms (April 2005) provides additional support for that proposition by defining the following terms.

*Distribution, Electric* The process of delivering electricity from convenient points on the transmission system to consumers.

\* \* \* \* \* \* \*

*Distribution System* The network of wires and equipment that is dedicated to delivering electric energy from the transmission system to the customer's premises. \* \* \*

(We quote the April 2005 edition because that is the edition the parties filed as a joint exhibit.)

[7] That some street light assets include convenience outlets does not make those street light assets distribution assets. Convenience outlets—18 feet above ground—are used mostly for decorative holiday lighting. They are, as intended, a convenience, and their presence does not transform street light assets into distribution assets.

system, they are necessarily a part thereof. We cannot agree. Street light assets are distinct from distribution assets; they have a different purpose and a different function. Moreover, street light assets can be disconnected from the distribution system without disturbing the distribution of electricity to any customer. Indeed, petitioner has sold street light assets to municipalities without affecting other customers in any way.

*Tenn. Natural Gas Lines, Inc. v. Commissioner*, 71 T.C. 74 (1978), and *Ill. Cereal Mills, Inc. v. Commissioner*, T.C. Memo. 1983–469, affd. on another ground 789 F.2d 1234 (7th Cir. 1986), both support petitioner. In *Tenn. Natural Gas Lines, Inc. v. Commissioner*, *supra* at 77, the taxpayer built a liquefied natural gas (LNG) storage facility to store gas in the summer (when demand is low) for use in the winter (when demand is high). The taxpayer argued that the liquefaction and vaporization equipment fell within asset class 49.23, Natural gas production plant, because its function was "similar to those of a natural gas production plant." *Id.* at 93; see Rev. Proc. 72–10, 1972–1 C.B. at 730. Specifically, the taxpayer argued that "in the liquefaction process impurities are removed from the gas, just as impurities are removed from natural gas at the wellhead." *Tenn. Natural Gas Lines, Inc. v. Commissioner*, *supra* at 93. The Commissioner argued that the liquefaction and vaporization equipment fell within asset class 49.24, Trunk pipelines and related storage facilities, because "the natural gas which enters the facility is already in a marketable state—further purification is needed for purposes of storage, not marketing"; therefore, "the LNG facility is nothing more than a complicated storage facility". *Id.*; see Rev. Proc. 72–10, 1972–1 C.B. at 730. The Court found for the Commissioner, stating:

We note that * * * [section 1.167(a)–11(b)(4)(ii)(*b*), Income Tax Regs.] does not refer to the *nature* of the equipment or the *manner* in which it operates; rather, this regulation emphasizes the *use* to which the equipment is put. In this case, the sole use of the entire LNG facility is to make natural gas suitable for storage. Marketable natural gas enters the facility, is stored, and approximately the same volume of marketable natural gas leaves the facility when the gas is needed for consumption. In no way is a marketable product *produced* by the LNG facility—a marketable product is merely *stored* there. [*Tenn. Natural Gas Lines, Inc. v. Commissioner*, *supra* at 94.]

Again, section 1.167(a)–11(b)(4)(iii)(*b*), Income Tax Regs., provides that "Property shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities." Here, although wires within street light assets move electricity from distribution lines all the way to the luminaires, the sole purpose and primary use of the equipment is to produce light, not to distribute electricity. *Tenn. Natural Gas Lines* supports petitioner.

In *Ill. Cereal Mills, Inc. v. Commissioner*, *supra*, the taxpayer was in the corn milling business and "purchased and processed vast amounts of shelled corn." The taxpayer argued that the grain storage tanks owned by its subsidiary fell within asset class 01.1, Machinery and equipment, including grain bins and fences but no other land improvements. See Rev. Proc. 72–10, 1972–1 C.B. at 723. Asset class 01.1 fell within the business-activity category 01.0, Agriculture, which included "only such assets as are * * * used in the production of crops * * * [or] the performance of agricultural * * * services." *Id.* The Commissioner argued that the grain storage tanks did not fall within asset class 01.1 because the taxpayer "primarily used [them] as storage for * * * raw materials for its manufacturing processes." *Ill. Cereal Mills, Inc. v. Commissioner*, *supra*. The Court found for the taxpayer because the subsidiary operated the storage facility "in the same manner" as the previous owner. *Id.* Moreover, even though the taxpayer purchased "between 45 and 60 percent of the grain" that the subsidiary stored at the storage facility, the taxpayer "would do so regardless of who owned and operated the facility." *Id.* The Court considered the grain storage business "at most * * * merely complementary" to the taxpayer's corn milling and manufacturing operation. *Id.* Importantly, the Court doubted that the Commissioner would have challenged that the grain storage tanks were "used in the production of crops" or "the performance of agricultural * * * services" had the storage facility been "owned and operated by someone other than" the taxpayer or its subsidiary. *Id.*

Similarly, we doubt that respondent would assert that street light assets were used in the distribution of electricity for sale were they owned and operated by some entity other than an electric utility. *Ill. Cereal Mills* supports petitioner.

b. *The Sale of Electricity*

Respondent implicitly argues according to the following syllogism: (1) The sale of street and area lighting is the sale of an electric service; (2) the sale of electricity is the sale of an electric service; and, therefore, (3) the sale of street and area lighting is the sale of electricity. Even assuming the truth of the premises (which we do not), that syllogism is invalid; specifically, it is an example of the fallacy of the undistributed middle.[8] In other words, an answer to respondent's argument is that not every sale of an electric service is the sale of electricity.

The syllogistic fallacy notwithstanding, petitioner uses street light assets to sell light, not electricity. Electricity is simply the raw material street light assets use to make light.

2. *Analogy With Asset Class 49.21*

Respondent asserts that asset class 49.14, Electric Utility Transmission and Distribution Plant, is analogous to asset class 49.21, Gas Utility Distribution Facilities, which "[i]ncludes gas water heaters and gas conversion equipment installed by utility on customers' premises on a rental basis". Rev. Proc. 87–56, 1987–2 C.B. at 685. Respondent argues that, if asset class 49.21 includes "gas conversion equipment", then, by analogy, asset class 49.14 includes "electricity conversion equipment" such as street light assets.

Respondent's argument is unconvincing; indeed, its logic cuts against him. The implicit premise of his argument is that the inclusion in asset class 49.21 of "gas water heaters and gas conversion equipment" was unnecessary. That is, asset class 49.21 would have encompassed those assets even without their explicit inclusion. Only that can explain respondent's conclusion that asset class 49.14 includes "electricity conversion equipment" despite the lack of any reference thereto.

Respondent seems to have the argument backward. Much more likely is that asset class 49.21 explicitly includes "gas conversion equipment" precisely because otherwise it would

---

[8] The middle term is the one (the sale of an electric service) that appears in both the major (first) and minor (second) premises. It is undistributed because neither premise describes *every* sale of an electric service; rather, the premises describe subsets of those sales that do not necessarily coincide. Therefore, the middle term fails to connect the sale of street and area lighting to the sale of electricity; both kinds of sales could separately constitute sales of electric services.

not. (Respondent does not explain the reason asset class 49.21 includes the superfluous "gas conversion equipment".) Therefore, respondent's argument cuts in favor of petitioner, because the absence of any reference to "electricity conversion equipment" in asset class 49.14 suggests that asset class 49.14 does not include such equipment. As petitioner observes, the Commissioner had the authority to include "electricity conversion equipment" (or, even better, "street and area lights") in asset class 49.14, and he did not.

### 3. *The Business-Activity Category*

Asset class 49.14 falls within the business-activity category titled "Electric, Gas, Water and Steam, Utility Services", see Rev. Proc. 87–56, 1987–2 C.B. at 685, which respondent asserts "broadly encompasses any activity involving the sale of electricity, gas, steam, or water services." Rev. Proc. 87–56, 1987–2 C.B. at 685, however, is not quite that broad, stating that the business-activity category in question "[i]ncludes assets used in the production, transmission and distribution of electricity, gas, steam, or water for sale including related land improvements." Respondent, at best, misquotes the business-activity category. Regardless, barring circular arguments, the actual business-activity category in question in no way supports respondent.

### 4. *The Regulatory Framework*

In 1997, PP&L was a regulated utility subject to the National Electric Safety Code (NESC), the National Electric Code (NEC), the Occupational Safety and Health Administration (OSHA), the Federal Energy Regulatory Commission (FERC), and the Pennsylvania Public Utilities Commission (PUC). Respondent argues that the frameworks of all five support his classification of street light assets.

### a. *The Safety Codes*

Three safety codes apply to street and area lighting: the NESC, the NEC, and the OSHA standards and regulations (the OSHA work rules). The purpose of the NESC is "the practical safeguarding of persons during the installation, operation, or maintenance of electric supply and communication lines and associated equipment"; the purpose of the NEC is "the prac-

tical safeguarding of persons and property from hazards arising from the use of electricity." The transition point between the NESC and the NEC is the service point. In effect, the NESC governs assets (including street light assets) that electric utilities control, and the NEC governs assets (including street light assets) that customers control. The OSHA work rules have a similar internal division: One set of rules, 29 C.F.R. sec. 1910.269 (1997), applies to electric power generation, transmission, and distribution; and another, 29 C.F.R. sec. 1910.302 (1997), applies to electric utilization systems. Again, the dividing line is control.

First, the NESC (and not the NEC) controls here because the NESC governs street light assets that PP&L controlled. Under the NESC, "utilization equipment" includes "[e]quipment, devices, and connected wiring that utilize electric energy for mechanical, chemical, heating, lighting, testing, or similar purposes and are not a part of supply equipment, supply lines, or communication lines." "Electric supply equipment" includes "[e]quipment that produces, modifies, regulates, controls, or safeguards a supply of electric energy." Respondent argues that street light assets are electric supply equipment because they "modify, regulate, and control the supply of electricity to customers." Such a broad reading of electric supply equipment not only ignores but also guts the definition of utilization equipment. What could possibly fall within the latter given respondent's broad reading of the former? Respondent is incorrect; we find that street light assets use "electric energy for * * * lighting". For that reason, under the NESC, street light assets are utilization equipment. The NESC supports petitioner.

Second, the OSHA work rules that govern street light assets that PP&L controlled are those that apply to electric power generation, transmission, and distribution. The two sets of OSHA work rules are intended to separate those assets that electric utilities generally control ("electric power generation, control, transformation, transmission, and distribution lines and equipment", 29 C.F.R. sec. 1910.269(a)(1)(i)) from those assets that others generally control ("electrical installations and utilization equipment installed or used within or on buildings, structures, and other premises", 29 C.F.R. sec. 1910.302(a)(1)). Given the problem we here face, we find the OSHA work rules without probative—and certainly without

legal—value. [9] The OSHA work rules do not support respondent.

b. *The Accounting Regulations*

The FERC Uniform System of Accounts sets forth a standard system of accounting used by public utilities and other entities that, among other things, enables Federal, State, and municipal regulators to compare those public utilities and to set retail and wholesale rates for electricity. FERC regulated PP&L's wholesale rates. (PUC regulated PP&L's retail rates.) PP&L recorded street light assets used for street lighting under FERC account 373, Street Lighting and Signal Systems, and recorded street light assets used for area lighting under FERC account 371, Installations on Customers' Premises. FERC accounts 371 and 373 both fall under the heading Distribution Plant.

PP&L reported its street and area lighting as the sale of kilowatt-hours, the basic unit of measurement for the supply of electricity. PP&L charged retail customers according to the electric rates that the applicable Pennsylvania regulatory agencies (primarily, PUC) established. In 1997, PP&L charged so-called bundled rates, meaning that every rate included the cost of generation, transmission, distribution, and all other cost components; that is, PP&L did not charge separately for each cost component. In 1997, street and area lighting constituted approximately 0.6 percent of PP&L's total electricity sales.

Respondent insists that, although "not determinative", the inclusion of street light assets in FERC accounts under the heading Distribution Plant is "persuasive" that both the electric utility industry and FERC consider street light assets "to be primarily used for distribution." In support, respondent

---

[9] In *Saginaw Bay Pipeline Co. v. United States*, 338 F.3d 600, 605–606 n.9 (6th Cir. 2003), the Court of Appeals for the Sixth Circuit rejected the reliance of the trial court on a case of the Court of Appeals for the Fifth Circuit. In that case, the Court of Appeals for the Fifth Circuit "had construed federal natural gas pipeline *safety regulations* to require that 'gathering' lines must attach directly to wellheads." *Id.* The Court of Appeals for the Sixth Circuit not only found the construction of the safety regulation to be "facially open to question", but noted that "any persuasive weight" the case might have "would be restricted to construction of the laws governing natural gas *pipeline safety*". *Id.* "No evident rationale supports the application of a safety regulation's judicially-refined definition of 'gathering pipeline' to the income tax depreciation regulations, given the total dissimilarity of the purposes of the two sets of standards." *Id.* We are similarly reluctant to consider electric safety regulations relevant to those same income tax depreciation regulations.

invokes *Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255 (10th Cir. 1999), revg. 109 T.C. 416 (1997). In that case, the Court of Appeals for the Tenth Circuit found the "distinction that FERC makes between gathering and transmission lines * * * persuasive that the gas industry and the regulatory body overseeing it consider gathering systems to be used for the activity of production, rather than transportation." *Id.* at 1262.

Respondent has failed to convince us that the inclusion of street light assets in FERC accounts under the heading Distribution Plant suggests anything about the proper classification of those assets for purposes of depreciation. In 1922, the Federal Power Commission (FERC's predecessor) adopted the first Uniform System of Accounts, which included account 357, Street lighting equipment, under the heading Utilization Capital. In 1936, the Federal Power Commission revised the Uniform System of Accounts, eliminating the separate functional groupings for Utilization Capital (and for Joint Transmission and Distribution Capital). We are not convinced that the change represented anything more than an attempt to simplify the regulatory regime.

That FERC required PP&L to account for street and area lighting revenues as sales of electricity does not necessarily mean that service is best characterized as the sale of electricity; it could simply mean that the distinction was not sufficiently important to be made for regulatory purposes. Indeed, given that in 1997 street and area lighting constituted less than 1 percent of PP&L's total electricity sales, the latter explanation strikes us as highly plausible. [10]

The Supreme Court has long recognized "the vastly different objectives that financial and tax accounting have." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542 (1979).

---

[10] The relevant FERC account is account 444, Public Street and Highway Lighting. There are two subheadings under the heading Operating Revenue; viz, (1) Sales of Electricity and (2) Other Operating Revenues. Account 444 is under the first subheading, Sales of Electricity. Account 444 "[includes] the net billing for electricity supplied and services rendered for the purposes of lighting streets, highways, parks and other public places * * * for municipalities or other divisions or agencies of state or Federal Governments." That FERC included account 444 under Sales of Electricity strikes us as sensible; electricity is the critical raw material required for street and area lighting, and reporting street and area lighting revenues as the sale of electricity surely simplifies the accounting.

The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. * * * [*Id.*]

We find the FERC Uniform System of Accounts to be of little relevance in answering the question before us.

### 5. *PP&L's Treatment of Street Light Assets*

Respondent argues that PP&L treated street light assets no differently from other distribution assets, and thus he concludes that street light assets are distribution assets. [11] First, "PP&L's transmission and distribution personnel operated and maintained PP&L's street and area lighting". Second, "PP&L's distribution specifications and instruction manuals incorporate specifications and engineering instructions for street and area lighting." Third, "PP&L warehouses its Street Light Assets at its System Facilities Center in Hazelton, Pennsylvania, and commingles the Street Light Assets with other distribution materials." Fourth, "in identifying Street Light Assets * * * for internal use, PP&L groups Street Light Assets with its distribution facilities." Surely what PP&L did was for convenience. Respondent's argument is of no avail.

### 6. *The Intent of Treasury*

Respondent argues:

Treasury designed the asset classification system to be as comprehensive as possible. Electric utility street [and area] lighting predates the asset classification system by more than half a century. * * * It is unlikely that Treasury simply ignored street [and area] lighting or intended to exclude street [and area] lighting from the applicable classes.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

* * * the asset classification system addresses all the industry's primary activities, including street and area lighting. * * * As a matter of historical fact and industry practice, street and area lighting is part of distribution. * * * Treasury therefore intended for the classification system to incorporate street and area lighting as part of a utility's distribution activity.

---

[11] That argument, if stated as a syllogism, is another example of the fallacy of the undistributed middle. See *supra* note 8 and accompanying text.

Respondent makes a plausible argument yet presents no evidence in its support. Even if Treasury intended asset class 49.14 to include street light assets, however, a preponderance of the evidence supports our conclusion that asset class 49.14 does not include those assets. Again, had the Commissioner explicitly included "electricity conversion equipment" in asset class 49.14, just as he included "gas conversion equipment" in asset class 49.21, we might answer the question before us differently. See Rev. Proc. 87–56, 1987–2 C.B. at 685. For whatever reason, he did not. Because street light assets are, in fact, primarily used to provide a lighting service and not to distribute electricity for sale, to resolve any ambiguity about the intent of the Treasury against respondent is under the circumstances fair and proper.

C. *Conclusion*

We find that petitioner has carried its burden of proof. Street light assets are "primarily used" to make light, not to distribute electricity. See sec. 1.167(a)–11(b)(4)(iii)(*b*), Income Tax Regs. Quite simply, street light assets provide light for public safety. Moreover, that that activity is insubstantial in relation to all petitioner's activities is irrelevant. See *id.* We thus find that street light assets are not used in the distribution of electricity for sale.

V. *Land Improvements*

A. *Introduction*

Although at trial respondent waived any argument that street light assets fell into any asset class other than asset class 49.14, on brief respondent suggested for the first time that "in the hands of a * * * taxpayer that does not sell electricity, Street Light Assets constitute a land improvement." Because respondent appeared to raise a new argument on brief, we ordered the parties to address the question.

In his supplemental brief, respondent argues that if street light assets do not fall within asset class 49.14, then they fall within asset class 00.3, Land Improvements, which includes "improvements directly to or added to land". See Rev. Proc. 87–56, 1987–2 C.B. at 677 ("Examples of * * * [land improvements] might include sidewalks, roads, canals, waterways, drainage facilities, sewers * * *, wharves and docks,

bridges, fences, landscaping, shrubbery, or radio and television transmitting towers."). Petitioner denies that street light assets are land improvements. We agree with petitioner.

Because he raises a new argument on brief that strikes us as contrary to his principal argument, respondent bears the burden of proving that, if street light assets do not fall within asset class 49.14, then they fall within asset class 00.3. See Rule 142(a); see also *Shea v. Commissioner*, 112 T.C. 183 (1999). Respondent does not argue otherwise.

B. *Analysis*

In *Trentadue v. Commissioner*, 128 T.C. 91, 99 (2007), we described the standards applicable to classifying assets as land improvements. We stated: "Generally, the [applicable] class life categories cover two broad groupings—permanent improvements to real property, and machinery and equipment that is not a real property improvement." *Id.* at 98. We addressed the proper classification of certain assets the taxpayers used in their vineyard: trellises for the grapevines, the drip irrigation system, and a well. *Id.* at 93–97. In our analysis, we applied the guidelines we had derived in *Whiteco Indus., Inc. v. Commissioner*, 65 T.C. 664 (1975) (finding that, for purposes of the investment tax credit, outdoor advertising signs constituted tangible personal property, not land improvements). Although the guidelines comprise six factors,

their primary focus is the question of the permanence of depreciable property and the damage caused to it or to realty upon removal of the depreciable property. No one factor has been considered to be determinative, and the guidelines have been used merely as an aid to deciding whether a particular property is or is not a permanent improvement to real property. [*Trentadue v. Commissioner*, *supra* at 99.]

As to street lights bolted to wood poles and area lights bolted to buildings, we find that, under the *Whiteco Indus.* guidelines, those street light assets are not affixed to anything in an inherently permanent way. Cf. *Standard Oil Co. v. Commissioner*, 77 T.C. 349, 406 (1981) ("Without extensive consideration, it is clear to us that, under the standards enunciated in the *Whiteco* case, the sign heads and light fixtures are not affixed to *anything* in an inherently permanent

way.”); *Musco Sports Lighting, Inc. v. Commissioner*, T.C. Memo. 1990–331 (“The lights in the instant case were merely bolted to the poles so, like the signs and lights in Standard Oil, they were not affixed to anything in an inherently permanent way.”), affd. 943 F.2d 906 (8th Cir. 1991). [12] As to street lights mounted on aluminum, steel, and boulevard fiberglass poles, [13] we discuss each *Whiteco Indus.* factor in turn.

1. “Is the property capable of being moved, and has it in fact been moved?” *Whiteco Indus., Inc. v. Commissioner*, *supra* at 672.

Street light assets are capable of being moved, and they have in fact been moved. Aluminum, steel, and boulevard fiberglass poles are bolted to concrete foundations. The poles can be quickly removed by loosening the bolts and are generally reused in other installations. Indeed, petitioner’s engineering instructions for street and area lighting directs that “[l]ow-mounted fluted (boulevard) standards shall not be scrapped.” Moreover, in many cases the foundations are precast concrete “plugs” that can be reused.

Street light assets have been moved and reused, and petitioner’s practice is to store used street light assets for future use. Accordingly, the first factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, *supra* at 100 (finding that the first factor suggested that trellises were not land improvements because they had been moved and reused and the drip irrigation system was a land improvement because few of its components could be reused if removed); *Standard Oil Co. v. Commissioner*, *supra* at 407 (finding that poles for service station signs and lighting “designed to be bolted to * * * concrete foundations were moved from place to place * * * [and] were certainly capable of being removed, stored, and reinstalled at other

---

[12] Respondent cites *Metro Natl. Corp. v. Commissioner*, T.C. Memo. 1987–38, for the proposition that sprinkler heads are an essential part of an underground water system even though they are easily disconnected from that system. Because sprinkler heads are functionally “inseparable from, and give utility to, the underground pipes”, they are part of the underground water system, an inherently permanent structure. *Id.* Respondent argues that street light assets are analogous to sprinkler heads. We disagree. Street light assets are not functionally inseparable from, and do not give utility to, distribution lines. (Service drops, however, are functionally inseparable from, and do give utility to, those lines. Thus, service drops, and not street light assets, are analogous to sprinkler heads. See *supra* sec. IV.B.1.a. of this report, in which we discuss the difference between service drops and street light assets.)

[13] See *infra* note 14 for a discussion of nonboulevard fiberglass poles.

locations"); *Whiteco Indus., Inc. v. Commissioner*, *supra* at 672 (finding that the first factor suggested the signs were not land improvements because they "are capable of being moved and have in fact been moved").

2. "Is the property designed or constructed to remain permanently in place?" *Whiteco Indus., Inc. v. Commissioner*, *supra* at 672.

Although street light assets can remain in place for their entire useful lives, they are both designed and constructed to be moved if necessary. Notwithstanding that street light assets are built to last, they are also built to be moved; they are not meant to remain permanently in place. Accordingly, the second factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, *supra* at 100–101 (finding that the second factor suggested that trellises were not land improvements because they were "changed or modified to accommodate the growth or the feeding of the vines" and the drip irrigation system was a land improvement because, with a few exceptions, "removal of the pipes and tubes is not easily accomplished, and so, for all practical purposes, they are permanently embedded in the ground"); *Standard Oil Co. v. Commissioner*, *supra* at 407–408 (finding that poles "designed to be bolted to the appropriate concrete foundations were, because of such design, meant to be movable * * * [and thus] were not designed to remain permanently in place"); *Whiteco Indus., Inc. v. Commissioner*, 65 T.C. at 672 (finding that the second factor suggested that the signs were not land improvements because they "are designed or constructed to last for the term of a contract * * * [(an average of 5 years), after which] the sign structure requires substantial renovation").

3. "Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?" *Whiteco Indus., Inc. v. Commissioner*, *supra* at 672.

Petitioner does not intend, and cannot realistically expect, street light assets to remain permanently in place. Petitioner often needs to move street light assets before the end of their useful lives, and thus the affixation of street light assets is inherently temporary. For example, street light assets are moved when streets and sidewalks are redone. Accordingly,

the third factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, 128 T.C. at 101 (finding that the third factor suggested that trellises and the drip irrigation system were land improvements because they were expected to service the grapevines during their useful lives); *Standard Oil Co. v. Commissioner*, 77 T.C. at 408 ("The poles designed to be bolted to the appropriate foundations were so designed because there are many circumstances that show that such poles might or would have to be moved."); *Whiteco Indus., Inc. v. Commissioner*, *supra* at 672–673 (finding that the third factor suggested that the signs were not land improvements because the taxpayer "does not intend, nor could it realistically expect, the signs to remain permanently in place").

4. "How substantial a job is removal of the property and how time-consuming is it? Is it 'readily removable'?" *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673.

The removal of street light assets is a relatively quick and easy process. Aluminum, steel, and boulevard fiberglass poles need simply to be unbolted from their concrete foundations, which are themselves often easily removed from the ground. Accordingly, the fourth factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, *supra* at 102 (finding that the fourth factor was neutral as to trellises and the drip irrigation system because the removal of both "would be time consuming if the components were being salvaged for future use" but otherwise would be "quick and inexpensive"); *Standard Oil Co. v. Commissioner*, *supra* at 409 (finding that poles that took up to "24 man-hours of jobsite labor" to remove were "readily removable"); *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673 (finding that the fourth factor suggested that the signs were not land improvements because the "disassembly and removal of a sign is a relatively quick and easy process"); *JFM, Inc. & Subs. v. Commissioner*, T.C. Memo. 1994–239 ("Although the [gasoline pump] canopy components are collectively formidable, the whole structure can be erected * * * or dismantled and moved in a few days.").

5. "How much damage will the property sustain upon its removal?" *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673.

The removal of street light assets does not damage them. Removing aluminum, steel, and boulevard fiberglass poles from concrete foundations involves simply loosening the bolts. No damage to street light assets or to any other property occurs. After the removal of the precast concrete "plugs", the resulting hole is filled with earth. Any disturbance is minimal. Accordingly, the fifth factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, *supra* at 103 (finding that the fifth factor was neutral as to trellises and the drip irrigation system because their careful removal would mean great cost and small damage, and their quick removal would mean small cost and great damage); *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673 (finding that the fifth factor suggested that the signs were not land improvements because "[m]uch of the sign assembly is not damaged when it is moved"); *Fox Photo, Inc. v. Commissioner*, T.C. Memo. 1990–348 (finding that modular, 1-hour photo labs, located predominantly in shopping center parking lots, "could be moved in 12 to 18 hours by five men in 2 to 3 days sustaining damage that was cheaper to repair than building a new lab").

6. "What is the manner of affixation of the property to the land?" *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673.

Aluminum, steel, and boulevard fiberglass poles are bolted to concrete foundations; they are not permanently affixed to the land. Accordingly, the sixth factor suggests that street light assets are not land improvements. Cf. *Trentadue v. Commissioner*, *supra* at 103 (finding that the sixth factor suggested that the trellises, not set in concrete and so easily removed, were not land improvements and that the drip irrigation system, buried in the ground and not easily removed, was a land improvement); *Whiteco Indus., Inc. v. Commissioner*, *supra* at 673 (finding that the sixth factor suggested that the signs were not land improvements because, even though the poles were set in concrete, the poles "can easily be removed from the ground, and as a matter of practice, they are so removed").

C. *Conclusion*

Every *Whiteco Indus.* factor suggests that street light assets bolted to concrete foundations are not land improve-

ments. There is not much evidence regarding nonboulevard fiberglass poles.[14] Yet respondent bears the burden of proof as to whether street light assets fall within asset class 00.3, and the parties address all street light assets as one indivisible group. We thus find that, for all street light assets, respondent has failed to carry his burden. We find that street light assets are not land improvements and that is consistent with our findings in several other cases. See *Trentadue v. Commissioner*, 128 T.C. at 106–107 (finding that trellises were not land improvements, but that the drip irrigation system was a land improvement); *Standard Oil Co. v. Commissioner*, 77 T.C. at 409 (finding that poles bolted to concrete foundations that held signs (ranging from 15 to 17 feet and 90 to 110 feet) and lights were not land improvements); *Whiteco Indus., Inc. v. Commissioner*, 65 T.C. at 673 (finding that wood advertising signs were not land improvements); *JFM, Inc. & Subs. v. Commissioner*, *supra* (finding that large gasoline pump canopies were not land improvements); *Fox Photo, Inc. v. Commissioner*, *supra* (finding that modular, one-hour photo labs were not land improvements).

## VI. *Conclusion*

Street light assets are neither assets used in the distribution of electricity for sale nor land improvements. Thus, street light assets do not fall within asset class 49.14 or asset class 00.3; rather, street light assets fall within the residual class. Street light assets are property without a "class life" and not otherwise classified under section 168(e)(2) and (3); they are, therefore, "7-year property". See sec. 168(e)(3)(C)(ii); Rev. Proc. 87–56, 1987–2 C.B. at 675. As such, street light assets have a recovery period of 7 years.

---

[14] Nonboulevard fiberglass poles are embedded approximately 5 feet in the ground and backfilled with cement, stone, and tamped earth. The cement foundations cannot be reused. Whether the fiberglass poles themselves can be reused is not clear. In *Standard Oil Co. v. Commissioner*, 77 T.C. 349, 407–409 (1981), we faced an almost identical situation, albeit in the context of the investment tax credit. In that case, in the absence of evidence, we stated that poles "embedded in concrete were probably movable", "seem as capable of being moved as those in *Weirick v. Commissioner*, [62 T.C. 446 (1974)]", "were possibly readily removable", and would sustain "possibly minimal" damage upon removal. *Standard Oil Co. v. Commissioner*, *supra* at 407–409. We found that the taxpayer had

failed to prove that the poles and * * * the concrete into which the [poles were] embedded are not "inherently permanent structures," though, with proof such as that which the Court of Claims had before it in * * * [*Southland Corp. v. United States*, 222 Ct. Cl. 22, 611 F.2d 348 (1979) (involving 20-foot poles holding signs outside "7-Eleven" stores)], we would likely find that they are not "inherently permanent structures." [*Id.* at 409.]

See sec. 168(c)(1). For that reason, PP&L properly reclassified street light assets, and respondent incorrectly disallowed petitioner's negative adjustment and depreciation consistent therewith.